Richard M. NIXON, Appellant,

v.

Rowland G. FREEMAN, III, as Administrator, General Services Administration, et al.

No. 79-2453.

United States Court of Appeals, District of Columbia Circuit.

· Argued Jan. 22, 1981.

Decided ;Feb. 9, 1982.

Alfred Mollin, Atty., Dept. of Justice, for appellee, Adm'r of Gen. Services. Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Glenn V. Whitaker, Atty., Dept. of Justice, Washington, D. C., were on brief for appellee, Adm'r of Gen. Services.

R. Stan Mortenson, Washington, D. C., with whom Herbert J. Miller, Jr., and James E. Rocap, III, Washington, D. C., were on brief for appellant.

Mark J. Spooner, Washington, D. C., with whom Peter T. Grossi, Jr., Leonard B. Simon and James J. Sandman, Washington, D. C., were on brief for appellees, The Reporters Committee for Freedom of the Press, et al.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and JOHNSON *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In this appeal from the District Court's grant of summary judgment, former President Richard M. Nixon challenges the con-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

stitutionality of regulations promulgated by the Administrator of General Services to implement the Presidential Recordings and Materials Preservation Act ("Act"), 44 U.S.C. § 2107 note (1976). Following a pretrial settlement of some of his claims, Mr. Nixon limited his challenge in the District Court to two features of the regulations: (1) the provision allowing public access to certain tape recordings, 41 C.F.R. § 105–63.404(c) (1980), and (2) the procedure by which government archivists plan to screen and identify tapes containing Mr. Nixon's personal diary. Mr. Nixon renews these claims on appeal, asserting violations of the Presidential privilege of confidentiality, his rights of political association under the First Amendment, and his privacy rights protected by the Fourth Amendment. He also contends that the District Court abused its discretion in limiting discovery after the submission of cross-motions for partial summary judgment.

We find Mr. Nixon's constitutional challenges unavailing. We also hold that, look-ing to the precise circumstances in which the issues arose, the District Court did not abuse its discretion in limiting Mr. Nixon's discovery efforts. The judgment of the District Court is, accordingly, affirmed.

I

The Act under which the challenged regulations were promulgated was itself the subject of an earlier suit by Mr. Nixon, and the background and decision in that case are relevant to his current contentions.[1] After Mr. Nixon resigned as President on August 9, 1974, the new administration halted the shipment to California of the Presidential materials accumulated during the Nixon Presidency. Negotiations between Mr. Nixon and the Administrator of General Services Administration (GSA) produced an agreement concerning the deposit and custody of the materials. Before that agreement became effective, however, it was superseded by the Act, which became law on December 19, 1974.[2] The Act direct-

---

1. A more detailed account of the factual background can be found in the opinions of the three-judge District Court and the Supreme Court in *Nixon v. Administrator*, 408 F.Supp. 321, 329–34 (D.D.C.1976), *aff'd*, 433 U.S. 425, 430–33, 97 S.Ct. 2777, 2783–85, 53 L.Ed.2d 867 (1977).

2. The controversy over the Nixon materials prompted subsequent congressional reconsideration of the traditional disposition and preservation of Presidential materials. That reconsideration resulted in the passage of the Presidential Records Act of 1978, Pub.L.No. 95–591, 92 Stat. 2523, 44 U.S.C. §§ 2201–2207 (Supp. III 1979), which "terminate[s] the tradition of private ownership of Presidential papers and the reliance on volunteerism to determine the fate of their disposition." H.R.Rep.No. 95–1487, 95th Cong., 2d Sess. 2 (1978), U.S.Code Cong. & Admin.News, pp. 5732, 5733. The Act is effective only with respect to Presidential records created during a term of office beginning on or after January 20, 1981. Pub.L.No. 95–591, § 3, 92 Stat. 2528 (1978). Section 2202 reserves to the United States complete ownership, possession, and control of Presidential records, and directs that the records be administered in accordance with the provisions of the Act. Section 2203(a)–(b) directs the President, while in office, to ensure adequate documentation of his official activities, and to categorize and file appropriately those documents to the extent practicable. The section also restricts the President while in office from disposition of materials that he thinks have no historical or other informational value unless he obtains the opinion of the Archivist of the United States, and unless the Archivist chooses not to consult with certain congressional committees over the proposed disposal. *Id.* § 2203(c). If the Archivist does undertake such consultation, the President can dispose of the materials only after submitting to the appropriate congressional committee a schedule of the disposal. *Id.* § 2203(d).

When a President leaves office, the Archivist is to assume responsibility for controlling, preserving, and making available to the public the Presidential materials. The Archivist has an "affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this Act." *Id.* § 2203(f)(1).

The President, while in office, has a limited ability to restrict eventual public access to certain materials. Section 2204(a) allows him to specify restrictions on materials falling within certain enumerated categories, but no such restriction can exceed twelve years. During the period of restriction, the determination whether access to particular material shall be restricted is to be made by the Archivist, after consultation with the President. *Id.* § 2204(b)(3). The President can challenge this determination in court. *Id.* § 2204(e).

ed GSA to take custody of all tape recordings and other Presidential materials accumulated during the Nixon Presidency,[3] and directed the Administrator to promulgate regulations governing public access to the materials. § 101(b)(1). The Administrator was then to submit the regulations to Congress, and either House had the power to disapprove them within ninety days of their submission. § 104(b).

One day after the Act's passage, Mr. Nixon brought suit in the District Court, challenging the Act's constitutionality and seeking declaratory and injunctive relief against it. A three-judge District Court ruled that the Act on its face did not violate the Constitution, *Nixon v. Administrator*, 408 F.Supp. 321 (D.D.C.1976). The Supreme Court affirmed, *Nixon v. Administrator*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

The Supreme Court emphasized that its holding was limited to the facial constitutionality of the Act. *Id.* at 436–39, 97 S.Ct. at 2786–2788. Because regulations governing public access could take a variety of forms, the Court did not address the constitutionality of any particular provision for public access. Instead, the Court primarily examined the Administrator's taking custody of and screening the materials. Other constitutional questions would be appropriate for judicial resolution only in the context of a challenge to regulations implementing the Act's broad provisions.

Mr. Nixon initiated such a challenge—the action now before us—in the District Court on August 10, 1977, seeking declaratory and injunctive relief against regulations promulgated by the Administrator to implement several provisions of the Act. On August 19, 1977, Mr. Nixon amended his complaint to include a challenge to certain revisions made to the regulations. J.A. 19. On December 16, 1977, the Administrator announced that regulations implementing section 104 of the Act, which governs public access to the materials, had become effective, having lain before Congress for ninety days without receiving the disapproval of either House. 42 Fed.Reg. 63626 (1977).[4] To consolidate the claims of the first amended complaint with his challenges to the more recent set of regulations, Mr. Nixon filed on January 31, 1978, a second amended complaint. J.A. 33.

On June 14, 1978, in response to a single motion, the court granted defendant-intervenor status to the Reporters Committee for Freedom of the Press, the American Historical Association, the American Political Science Association, James MacGregor Burns, Nat Hentoff, Donald G. Herzberg, William Leuchtenberg, Arthur Link, J. Anthony Lukas, Austin Ranney, and Clement E. Vose. J.A. 13. Thereafter the parties reached a settlement agreement on February 14, 1979, which called for certain amendments to the regulations and disposed of all of Mr. Nixon's challenges but those concerning the creation of archival listening centers, 41 C.F.R. § 105–63.404(c) (1980), and archival screening of tapes and dictabelts containing Mr. Nixon's personal diary. J.A. 95. By the terms of the settlement, the parties agreed to litigate these two issues while the revised portions of the

---

**3.** These Presidential materials, it was estimated, consist of some 42 million pages of documents and 880 tape recordings. *Nixon v. Administrator*, 433 U.S. 425, 430, 97 S.Ct. 2777, 2783, 53 L.Ed.2d 867 (1977).

**4.** The set of regulations that became effective on this date was the fourth set of public access regulations submitted by the Administrator to Congress. The first set, submitted on March 19, 1975, was disapproved by the Senate on September 10, 1975. S.Res. 244, 94th Cong., 1st Sess. (1975); *see* S.Rep.No.94–368, 94th

Cong., 1st Sess. (1975). Congress received the second set on October 15, 1975, and the Senate disapproved several regulations concerning public access on April 8, 1976. S.Res. 428, 94th Cong., 2d Sess. (1976); *see* S.Rep.No.94–748, 94th Cong., 2d Sess. (1978). On April 13, 1976, the Administrator submitted revised versions of those disapproved regulations, all but one of which the House disapproved on September 9, 1976. H.Res. 1505, 94th Cong., 2d Sess. (1976); *see* H.R.Rep.No.94–1485, 94th Cong., 2d Sess. (1976).

regulations were submitted to Congress for approval.[5]

To implement the agreement, Mr. Nixon filed a third amended complaint on March 7, 1979, counts I and II of which were to be dismissed when the revised regulations became effective. J.A. 183. Because neither House disapproved of the revised regulations within ninety days of their submission, those regulations became effective on March 7, 1980. 45 Fed.Reg. 14856 (1980).

At the time Mr. Nixon filed the third complaint, he also submitted a schedule for disposition of the two unsettled issues. The schedule suggested a brief period for discovery of material "reasonably necessary for filing of dispositive motions," followed by the filing of plaintiff's motion for summary judgment and defendants' opposition or cross-motion for summary judgment. J.A. 190. The court accepted this schedule on March 14, 1979. After the Administrator responded to Mr. Nixon's interrogatories and requests for admissions, Mr. Nixon on May 4, 1979, moved for summary judgment on counts III and IV of his third amended complaint. J.A. 225. Because the settlement agreement provided for the dismissal of counts I and II when Congress approved the revised regulations, the May 4 motion, though styled a motion for partial summary judgment, sought summary judgment on both of the remaining contested issues.

Shortly after filing that motion, on May 8, 1979, Mr. Nixon sought leave to depose Robert Lipshutz, White House Counsel, to discover whether the White House possessed "any materials relevant to the tapes access issue." J.A. 273. The Administrator objected to this effort, and the court denied Mr. Nixon's motion. J.A. 15. On June 1, 1979, the Administrator filed a cross-motion for partial summary judgment, J.A. 289, and the intervenor-defendants filed such a motion on June 8, 1979, J.A. 337. Mr. Nixon then attempted further discovery. He noticed the depositions of the Archivist and Deputy Archivist of the United States, and subpoenaed from those individuals all documents "pertaining to the gifts or other transfers of tape recordings involving Presidents Kennedy and Johnson to the National Archives and any agreement, plan, or consideration given to the question of public listening to those recordings." J.A. 362, 363. The Administrator responded by moving for an order quashing the subpoenas and for a protective order prohibiting further discovery until the court had resolved the cross-motions for partial summary judgment. J.A. 365. On June 24, 1979, the court granted the Administrator's motion, J.A. 16, and on July 23, 1979, issued an order granting defendants' motions for partial summary judgment. J.A. 17. After Mr. Nixon moved for reconsideration of the order, the court issued on October 12, 1979, another order denying Mr. Nixon's motion and entering final judgment against him. J.A. 18.[6] Mr. Nixon then filed this appeal.

## II

In reviewing Mr. Nixon's claims in the context of an appeal from the District Court's grant of summary judgment, we are mindful of our obligation to uphold the District Court only if there is no genuine issue of material fact requiring more intensive exploration of Mr. Nixon's claims. Fed.R.Civ.P. 56(a). We proceed, therefore, to inquire whether, on the record before us, the defendants were entitled to judgment as a matter of law on both the issue of public access to tape recordings and the issue of archival screening of diary material.

---

**5.** The settlement agreement also provided that neither plaintiff nor defendants would rely on the one-House veto provision of the Act to argue for or against the constitutionality of the regulations. J.A. 97. Mr. Nixon contends that defendants breached this agreement by submitting to the court, prior to judgment, memoranda arguing that congressional acquiescence to

the regulations supported their validity. Because the one-House veto does not bear upon our analysis, we need not address Mr. Nixon's contention.

**6.** The October 12 order also stated that there had been no breach of the settlement agreement. *See* note 5 *supra*.

Although Mr. Nixon limits his challenge to these two aspects of the regulations, an evaluation of his claims requires an understanding of the system of processing and public access created by the regulations. The regulations apply to all the "Presidential historical materials of the Nixon Administration," 41 C.F.R. § 105–63.102 (1980), defined to include all materials "made or received by former President Richard M. Nixon or by members of his staff in connection with his constitutional or statutory powers or duties as President and retained or appropriate for retention as evidence of or information about these powers or duties." *Id.* § 105–63.104(a). The Administrator is to begin the initial archival processing, *id.* § 105–63.401(a), which consists of arranging, indexing, transcribing, and reproducing materials, as well as identifying materials requiring further processing and identifying and preserving materials in poor physical condition. *Id.* § 105–63.104(h).

This initial processing is the first step of the regulations' detailed scheme for identifying those materials to which the public may have eventual access, and for opening such materials to the public. In brief outline, those procedures call for the archivists, during the initial processing period, to seg-regate from the Presidential materials any material determined to fall within one or more of several categories. If a certain segment of materials falls in none of those categories, the Administrator is to move toward opening the material to public access. At least thirty days before the opening, the Administrator must publish notice of it in the Federal Register, and then receive and determine any challenge to the proposed opening.

The archivists assigned by the Administrator have sole responsibility for making the initial determination whether materials should be segregated or otherwise restricted from public access. *Id.* § 105–63.401–2(a)–(c). The regulations give detailed guidance as to both the types of materials the archivists are to separate and the procedure for making the determination to segregate. First, the archivists are to give priority to segregating "private or personal materials" and transferring them to their owner, *id.* § 105–63.401–2(a).[7] Second, the archivists are to segregate materials that neither relate to "abuses of governmental power"[8] nor otherwise have "general historical significance."[9] *Id.* § 105–63.401–2(b). Third, the archivists are to segregate materials subject to certain enumerated restrictions.[10]

---

**7.** These materials are defined as "those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other nongovernmental activities, including private political associations, and having no connection with his constitutional or statutory powers or duties as President or as a member of the President's staff." 41 C.F.R. § 105–63.104(b) (1980).

**8.** The regulations define these materials as those concerning the

alleged acts, whether or not corroborated by judicial, administrative or legislative proceedings, which allegedly were conducted, directed or approved by Richard M. Nixon, his staff or persons associated with him in his constitutional or statutory functions as President, or as political activities directly relating to or having a direct effect upon those functions, and which (1) were within the purview of the charters of the Senate Select Committee on Presidential Campaign Activities or the Watergate Special Prosecution Force; or (2) are circumscribed in the Articles of Impeachment adopted by the House Commit-

tee on the Judiciary and reported to the House of Representatives for consideration in House Report No. 93–1305.

*Id.* § 105–63.104(c).

**9.** These materials are defined as those "having administrative, legal, research or other historical value as evidence of or information about the constitutional or statutory powers or duties of the President, which an archivist has determined is of a quality sufficient to warrant the retention by the United States of materials so designated." *Id.* § 105–63.104(d).

**10.** A different, and generally less protective, set of restrictions applies to materials concerning "abuses of governmental power" than to materials having only "general historical significance." Both types of materials are to be restricted when (1) the Administrator is in the process of determining a challenge to proposed access to the material, (2) release of the material would violate a federal statute, and (3) the materials are authorized to be kept secret under criteria established by Executive Order. *Id.* §§ 105–63.402–1, 105–63.402–2(a). The Ad-

If the archivists are unable to determine whether certain material falls within one of these categories, or if the archivists conclude that the determination will raise a significant issue of interpretation or have far-reaching precedential value, they are to submit the matter to the Senior Archival Panel. *Id.* § 105–63.401–2(d). That panel of archivists, whose members are chosen by the Archivist of the United States, then has the sole responsibility for making the initial determination. If the panel, however, is also unable to make the determination, or is also struck by the significance of the required interpretation, the panel is to submit the matter to the Presidential Materials Review Board. That five-member board, which includes as Chairman the Archivist of the United States, then becomes responsible for making a determination, whose finality depends on the type of issue involved. If the Board must determine whether materials are "private or personal," or whether materials neither relate to "abuses of governmental power" nor otherwise have "general historical significance," the Board is to make the final administrative determination, in the form of a written decision together with any concurring and dissenting opinions. *Id.* § 105–63.401–2(g). If the required determination involves other enumerated restrictions, the Board is to recommend an initial decision to the Senior Archival Panel, which retains the sole responsibility for the initial determination. *Id.* § 105–63.401–2(h).

Once material forming an "integral file segment" [11] has undergone initial processing and has escaped segregation as described above, the Administrator must prepare to open the segment to public access "[a]s soon thereafter as possible." *Id.* § 105–63.-401(a). The Administrator must publish notice of the proposed opening, at least thirty days before its occurrence, in the Federal Register, reasonably identifying the material and including a reference to the right of any person to file a claim objecting to the publication. Copies of that notice are to be sent to Mr. Nixon, his designated agent, or his heirs. *Id.* § 105–63.401(b). Within thirty days of the publication of the notice, any person claiming a constitutional or legal right or privilege that would limit public access must notify the Administrator of that right. *Id.* § 105–63.401–1(a). The procedure for resolving such a claim depends on its content. Unless the claim states that the materials are private or personal, the Administrator is to make the decision regarding access. *Id.* If the claim alleges that the materials are private or personal, the Administrator is to transmit the claim to the Presidential Materials Review Board. *Id.* § 105–63.401–1(d). Upon receiving such a matter, the Board must notify the claimant of its impending consideration of the claim, and allow him to supplement his reasons for the claim. The Board must also publish notice of its consideration in the Federal Register, and then receive and take into account the views of any member of the public respecting the public or private nature of the materials. After considering all the positions put forth, the Board must issue a decision, including any concurring or dissenting opinions, that serves as the final administrative decision on the matter. *Id.* § 105–63.401–2(i).

ministrator may waive this last restriction under certain conditions. The Administrator is also to restrict materials relating to abuse of governmental power when their release would constitute a clearly unwarranted invasion of personal privacy, subject to the condition that the Administrator will make available those portions that are essential to an understanding of abuses of governmental power. *Id.* § 105–63.402–1(b).

If materials have only general historical significance, the Administrator is also to restrict them when their release would (1) disclose privileged or confidential trade secrets or commercial information, (2) constitute libel or a clearly unwarranted invasion of personal privacy, or (3) disclose investigatory materials compiled for law enforcement purposes, but only under certain circumstances. *Id.* § 105–63.-402–2(b).

11. The Nixon Materials Archival Processing Manual, which describes certain processing procedures that the parties agreed upon, states that the phrase "integral file segment" ordinarily refers to "an archival determination that a particular group of processed documents constitutes an intelligible and complete unit for purposes of historical research." J.A. 164.

Whenever the Administrator receives a claim that a proposed access will violate a legal or constitutional right, the material at issue is to be restricted until determination of the claim. *Id.* §§ 105–63.402–1(a)(1), 105–63.402–2(a). If that determination is adverse to the claimant, the Administrator must refrain from opening the material to public access for at least thirty days after the claimant receives notification of the decision. *Id.* § 105–63.401–1(a), (d). The regulations do not discuss judicial review, but section 105(a) of the Act grants exclusive jurisdiction to the United States District Court for the District of Columbia to hear and expedite challenges to such determinations.

The Presidential material determined, by the above-described procedure, to be open to the public then becomes available for public reference in locations and under rules that the Administrator shall prescribe. *Id.* § 105–63.403. In particular, the regulation challenged by Mr. Nixon states that researchers may listen to reference copies of tape recordings at the National Archives Building in Washington, D.C., and at other locations chosen by the Administrator. *Id.* § 105–63.404(c). Pursuant to that authority, the Administrator has designated eleven archival centers throughout the country at which the public may listen to copies of tape recordings. The regulations, however, do not allow members of the public to reproduce the tapes. *Id.* § 105–63.405(a).

The description of the regulatory scheme would not be complete without some discussion of additional processing procedures agreed upon by the parties, as well as the processing already undertaken by the Administrator and his staff of archivists. By the terms of the February 14, 1979, pretrial settlement, the parties agreed on certain procedures that the Administrator would employ in carrying out his processing responsibilities under the regulations. These procedures, set forth in the "Nixon Materials Archival Processing Manual," call for three phases of archival processing.

In Phase I processing, the archivists examine the materials essentially to establish physical and documentary control over them. This phase includes, for example, the development of preliminary finding aids, the correction of physical deterioration, the rewinding of original tapes, and the duplication of tapes while monitoring them for sound quality. Affidavit of Richard A. Jacobs, Deputy Assistant Archivist and Acting Director of the Nixon Presidential Materials Project, J.A. 292 [hereinafter "Jacobs Affidavit"]. Phase I processing had been completed at the time the District Court considered the parties' cross-motions for partial summary judgment.

The main purpose of Phase II processing is to develop more sophisticated finding aids to the materials, including folder title lists, series descriptions, and a general subject log. This phase requires archivists to listen to the tapes and note the time of the conversation, the participants, and the subject of the discussion. *Id.*, J.A. 293–94. At the time the parties filed motions for partial summary judgment, Phase II processing was underway. The archivists, however, had voluntarily foregone Phase II processing of any dictabelts because Mr. Nixon claims to have dictated his diary primarily onto dictabelts. *Id.*, J.A. 293.

Phase III processing consists of the final archival tasks necessary to prepare the materials for public access. During this phase the archivists review the materials for the purpose of identifying and segregating the materials not subject to public access. As of several weeks before the District Court entered judgment against Mr. Nixon, no Phase III processing had yet taken place. *Id.*

### III

Mr. Nixon argues that the regulations' provision for the creation of archival centers where members of the public can listen to copies of certain tape recordings infringes a number of constitutionally based interests: his personal privacy interest in the recordings to be made public, his right to political privacy guaranteed by the First Amendment, and the Presidential privilege of confidentiality. The constitutional na-

ture of these interests, so it is said, requires that any regulations necessary to implement the Act's purposes do so in the manner least intrusive to the constitutionally rooted interests implicated by those regulations. According to Mr. Nixon, section 105–63.404(c) fails in this respect because the Administrator could have chosen means for providing public access to the tape-recorded messages that would fully serve the Act's purposes yet infringe less severely on Mr. Nixon's constitutional interests. For example, the Administrator could have allowed public access only to synopses or transcripts of the tapes, could have made available to the public only those tape recordings relating to Watergate, or could have restricted the availability of the recordings for a fixed period of years.

### A.

█ Insofar as Mr. Nixon premises the regulation's invalidity on its alleged invasion of his constitutional right of privacy, his argument has little force. He defines the privacy interest on which his claim rests not as the right of privacy that attaches to particular private or personal materials such as diaries and letters, but rather as a right of an individual to operate personal and business affairs within a "zone of privacy," out of the public's view or listening. Appellant's Brief, at 21. Mr. Nixon, however, can claim no such broad right of privacy with respect to his life while President. For Presidents and ordinary citizens alike, a personal privacy interest protected by the Fourth Amendment must find its source in a legitimate expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967); *Nixon v. Administrator*, 433 U.S. at 457–58, 97 S.Ct. at 2797–98. Mr. Nixon while President could have had such an expectation in some materials, such as diaries or other communications respecting personal matters unrelated to his public duties, *id.*, but not in materials relating to the conduct and official duties of the Presidency, *id.* at 459, 97 S.Ct. at 2798.

Since the regulations charge the archivists with identifying and returning to Mr. Nixon private or personal material, and provide a procedure for asserting constitutionally based objections to any public access, the archival listening center regulation will not result in the public's listening to recordings implicating Mr. Nixon's privacy rights.

Mr. Nixon disputes this conclusion by arguing that he has a personal privacy interest even in those tapes pertaining to the official business of the Presidency. He argues that to conclude otherwise is to focus improperly on the content of the communication, rather than on the communicant's expectation of privacy. But the distinction between personal or private communications and communications relating to the official business of the Presidency rests upon the recognition that the public trust historically attaching to official Presidential materials and a President's assumption of a public role undercut the reasonableness of a President's expectation of privacy in official materials. *Id.* at 455, 97 S.Ct. at 2796; *Nixon v. Administrator*, 408 F.Supp. at 358–59 & n.53.

Mr. Nixon attempts to avoid this conclusion by distinguishing the instant challenge from *Nixon v. Administrator.* Here, he argues, his challenge is not limited, as it was in that case, to mere archival screening, but concerns actual public listening to the tapes. The fact that public access is the subject of this challenge, however, does not make more persuasive Mr. Nixon's attempt to assert a privacy interest in tapes relating to the official business of the Presidency. Such materials are deemed nonprivate precisely because of the public's traditional interest in and eventual access to them, as well as a President's voluntary assumption of his role as public leader. Nor does the form of the public access challenged here aid his privacy argument. The fact that the public can listen to the tapes, rather than read transcripts or synopses, does not allow him to assert a personal privacy interest in otherwise nonprivate materials.

## B.

 We reach a similar conclusion with respect to Mr. Nixon's claim that the regulation infringes his rights of associational privacy protected by the First Amendment. As the Supreme Court recognized in *Nixon v. Administrator*, Mr. Nixon while President could legitimately have expected a chance to remove from the public's eye documents concerning his private political associations. 433 U.S. at 466, 97 S.Ct. at 2801. The tapes, therefore, undoubtedly contain some matters falling within the First Amendment's protection of involvement with partisan politics, *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). But the regulations charge the archivists to give priority to separating and returning to Mr. Nixon "private and personal materials," which are defined to include materials relating solely to private political associations. 41 C.F.R. § 105–63.104(b) (1980). Even if an archivist determines that a tape does not fall within that category, no disclosure will occur until after Mr. Nixon has had a chance to appeal the determination both administratively and judicially.

## C.

 Mr. Nixon also claims that the listening center regulation overbroadly infringes upon the Presidential privilege of confidentiality. In elaborating on this privilege in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court distinguished between claims of privilege in particular communications including military, diplomatic, or national security interests, and the broader and undifferentiated claim of interest in preserving the confidentiality of executive determinations. *Id.* at 706, 94 S.Ct. at 3106.[12] The latter privilege flows from the recognition that fear of disclosure may chill the candid advice and discussion necessary to effective decisionmaking. *Id.* at 705–06, 94 S.Ct. at 3106–07. Hence, a court faced with a claim based on the privilege must ask whether the regulation would impair the ability of present and future Presidents to obtain the confidential discussion and advice necessary to effective discharge of their duties. Any such impairment, however, must be balanced against the adverse impact that recognition of the privilege would have on the legitimate congressional purposes furthered by the Act. *Nixon v. Administrator*, 433 U.S. at 447, 97 S.Ct. at 2792.

 Mr. Nixon argues that this balancing requires invalidation of the listening center regulation, because the Administrator was obligated to consider, and could have chosen, less intrusive means of accomplishing the Act's purposes, such as:

(1) making public only Watergate-related tape recordings;

(2) making public only transcripts or synopses of tape recordings;

(3) restricting access to non-Watergate-related tapes (or transcripts) for a fixed period of years; and

(4) variations on the first three proposals, such as allowing immediate access only to synopses of Watergate-related tapes.

In measuring the degree to which the regulation infringes on the privilege, we note again that the regulations allow public access only to certain materials. The screening archivists will not even propose to open material to public access until they or reviewing archivists have determined that the material is not private or personal. 41 C.F.R. § 105–63.401–2(a) (1980). In addition, they cannot recommend access until they have decided that the material is not

---

**12.** Although Mr. Nixon's arguments appear to center on an alleged infringement of the latter, broader claim of privilege, we should note that the listening center regulation does not violate executive privilege as more narrowly defined. The archivists have an affirmative obligation generally to restrict materials authorized to be kept secret under criteria established by Executive Order, as well as materials whose disclo-sure would violate a federal statute. 41 C.F.R. §§ 105–63.402–1(a)(3)–(4), 105–63.402–2(a) (1980). Moreover, by means of the procedure described above, the regulations allow Mr. Nixon to assert any constitutional or legal right or privilege that would limit disclosure, and require restriction until resolution of such a claim.

subject to any of the restrictions enumerated in the regulations, one of which relates to material that would "constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person." *Id.* §§ 105–63.402–1(b), 105–63.402–2(b)(2). Proposed disclosure of materials determined to fall within none of these categories is then subject to challenge by any person claiming a constitutional or legal right or privilege that would limit disclosure. *Id.* § 105–63.401–1(a). No tape will be made public, therefore, until Mr. Nixon and any others whose rights or privileges are implicated by disclosure have had an opportunity to object to disclosure and obtain judicial review of any adverse determination.

The opportunity to challenge particular disclosures, of course, does not guarantee that whatever access is eventually allowed will have no adverse effect on the Presidential privilege of confidentiality. Even if public access to a given segment of materials presented little threat of chilling executive discussion now and in the future, one could argue that public access to many segments has some such effect.

Whether the infringement Mr. Nixon alleges is viewed as resulting from particular disclosures or from their cumulation, we see several reasons for discounting its seriousness. As the Supreme Court noted in *Nixon v. Administrator*, an incumbent President is best situated to judge when disclosure will adversely affect his receipt of candid advice and discussion. 433 U.S. at 449, 97 S.Ct. at 2793. Although a former President may assert the privilege, the incumbent's failure to mount a similar challenge at the time Mr. Nixon brought this suit weakens the force of the former President's claim. *Id.*

Even more damaging to Mr. Nixon's claim is the fact, emphasized by the Court in *Nixon v. Administrator*, that the privilege he asserts is not a fixed and permanent one, but erodes with the passage of time. Citing the research of the three-judge District Court, the Supreme Court noted that "there has never been an expectation that the confidences of the Executive Office are absolute and unyielding." *Id.* at 450, 97 S.Ct. at 2793. As the District Court observed in *Nixon v. Administrator*, Mr. Nixon, like every President before him since Herbert Hoover, plans to deposit Presidential materials in a Presidential library, and he installed the taping system in part to aid him in preparing memoirs. 408 F.Supp. at 345–46. Although there is no fixed number of years that can measure the duration of the privilege, it is significant that no public access will occur until at least eight years after the event disclosed.[13]

The purposes furthered by the regulations, moreover, are those that the Supreme Court in *Nixon v. Administrator* found to be ample justification for the Act. Broadly formulated, those interests relate to the importance of preserving "an accurate and complete historical record." 433 U.S. at 452 n.14, 97 S.Ct. at 2795 n.14 (quoting 408 F. Supp. at 349). That goal furthers the general public's need for full airing and understanding of the events of the Nixon Presidency, as well as Congress's interest in understanding the functioning of the political process during that time. 433 U.S. at 453, 97 S.Ct. at 2795.

**13.** Although not determinative of the issue before us, it is instructive to note the comments of the House Committee on Government Operations in recommending the bill that became the Presidential Records Act of 1978, *see* note 2 *supra*. The Committee Report noted that a major theme during hearings on bills relating to Presidential records was "balancing ready availability of the records against the prospect that premature disclosure might have a 'chilling effect' on Presidents and the frankness of advice they could expect from their staffs." H.R.Rep.No.95–1487, 95th Cong., 2d Sess. 8

(1978), U.S.Code Cong. & Admin.News at p. 5739. Most witnesses, the Report added, felt that "a period of 10 years or less in which the President could assert some restrictions would be sufficient to accommodate these policy and legal concerns." *Id.* at 9, U.S.Code Cong. & Admin.News at p. 5740. Congress eventually chose to allow Presidents to designate restrictions on certain materials for a maximum period of twelve years, but made the Archivist responsible for determining whether particular matters fall within those restrictions. *See* note 2 *supra*.

Congress viewed public access as furthering these interests. In section 104(a) of the Act, it charged the Administrator to take into account seven factors, which included "the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate,'" and "the need to provide public access to those materials which have general historical significance...."

We disagree with Mr. Nixon's argument that the Administrator chose overbroad means of accomplishing these congressional goals. It is true that all of Mr. Nixon's suggestions for alternative means of public access are more protective of the tapes than are the regulations; the question, however, is whether these forms of guarding the tapes add any necessary protection to the privilege of confidentiality.[14] We cannot conclude that these proposals represent any further safeguard of the privilege significant enough to justify their interference with the Act's goal of public access. Indeed, we think that some of Mr. Nixon's alternatives add no meaningful protection to the privilege at all.

We need not draw on disputed empirical evidence to conclude that reading transcripts or synopses, no matter how conscientiously or expertly made, is less effective a form of public access than listening to the tapes themselves. To name but a few of the differences between the spoken and written word, phrases may be inaudible or indiscernible, inflections may vary the meaning of a particular word or phrase, and silences or pauses may form part of a conversation's content. Even Mr. Nixon's counsel, who by his own account has listened to many of the Presidential tapes, has stated that many portions of the tapes are of poor quality and are often unintelligible. He claims, nonetheless, that transcripts or synopses are as effective as or superior to tapes.

> "I do not believe that direct access to the recordings significantly increases the listener's ability to understand the conversation, either as to its drama, content or any other factors .... [I]t is literally impossible to resolve disputes as to the content of much of the recordings."

Affidavit of R. Stan Mortenson, J.A. 382–83. We think this view misses the point. If a statement is inaudible or ambiguous, the ability to listen and form one's own conclusion rather than rely on another's rendition furthers the congressional goal of providing the public with full information about the Nixon Presidency.

In addition, we doubt seriously that making transcripts or synopses available instead of tapes would lessen any threat to the privilege of confidentiality posed by disclosure of the tape's contents. Presumably such transcripts or synopses would represent attempts to convey, in written form, the full content of the taped material. Any difference between the taped message and its written formulation would likely represent a difference of completeness or accuracy, not any difference even arguably relevant to protecting confidential matters.

Many of Mr. Nixon's alternative access proposals also call for restricting access to at least some of the tapes for a fixed period of years. He suggests, for example, limiting access to non-Watergate-related tapes for twenty-five years, or until the death of

---

14. Most of Mr. Nixon's proposals are more restrictive of materials relating to "general historical significance" than of those relating to Watergate. Mr. Nixon is correct in discerning a congressional emphasis on providing public access to Watergate-related materials; the Act refers to the need for public access to those materials "at the earliest reasonable date." § 104(a)(1). But Mr. Nixon is wrong in reading into this emphasis a negative emphasis on providing public access to materials of general historical significance; the Act also refers to "the need to provide public access to those materials." § 104(a)(6). Apparently Mr. Nixon reads the language requiring the "earliest reasonable" access to Watergate-related materials as allowing delayed access to other historically significant material. That reading is not a supportable one. Congress may have wanted the Administrator to give priority to processing Watergate-related materials and preparing them for public access. That wish, however, does not imply congressional acquiescence to delayed public access to other historically significant materials whose processing has been completed by the archivists.

the participants or those who were the subject of the conversation. These suggestions are reminiscent of Justice Powell's concurring opinion in *Nixon v. Administrator*, which, written "with an eye toward the kind of regulations ... that would be consistent with the Act and yet that would afford protection to the important constitutional interests" at stake, suggested certain features that the regulations might contain. 433 U.S. at 495–96, 97 S.Ct. at 2816–17 (Powell, J., concurring). Quoting the District Court, Justice Powell wrote that "substantive restrictions on access might be adopted, consistent with traditional restrictions placed on access to Presidential papers, and that such restrictions could forbid public disclosure of any confidential communication between [Mr. Nixon] and his advisors 'for a fixed period of years, or until the death of Mr. Nixon and others participating in or the subject of communications.'" *Id.* at 497, 97 S.Ct. at 2817 (quoting 408 F.Supp. at 338).

Keeping in mind the complete regulatory scheme and Justice Powell's suggestions, we think that the regulations adequately protect the privilege of confidentiality without adoption of Mr. Nixon's proposals. First, to some extent, the time restriction proposals aim to protect privacy interests of participants in or subjects of conversations. Those privacy interests, however, find ample protection in the various affirmative

duties of archivists to restrict materials implicating privacy rights, and in the opportunity of individuals to assert privacy-based challenges to particular disclosures. Second, we have difficulty concluding that imposing a blanket time restriction of, say, twenty-five years would represent enough additional protection to the privilege to justify the serious denial of public access that would result from the restriction. This conclusion becomes apparent when we recall that Mr. Nixon would add this restriction to a regulatory scheme that, as described above, already requires restriction of certain classes of material, not unlike the system of restrictions to which Justice Powell referred.[15]

Moreover, the regulations allow Mr. Nixon to raise his claim of privilege with respect to particular disclosures before they occur. As we recognized earlier, one could argue that a system allowing individual challenges cannot effectively guard against some cumulative effect of disclosures. To adopt a blanket time restriction for that reason, however, would require us to believe that those tapes which survive restriction pursuant to archival segregation and outside challenge, and which contain conversations occurring at least eight years ago, nonetheless pose a threat to executive decisionmaking great enough to justify an additional twenty-five years of restriction.[16]

---

**15.** Quoting the District Court, Justice Powell set forth a basic set of donor-imposed access restrictions followed by several recent Presidents. 433 U.S. at 497 n.3, 97 S.Ct. at 2817 n.3. That set, quite understandably, is not as complex as the nonvoluntary scheme of restrictions set forth in the regulations. For example, the categories of restrictions in the regulations generally apply more forcefully to material of general historical significance unrelated to abuse of governmental power. Nonetheless, some instructive similarities exist between the regulations and the restrictions mentioned by Justice Powell. Both sets provide protection for material affecting national security and governmental affairs, 41 C.F.R. §§ 105–63.402–1(a)(4), 105–63.402–2(a) (1980); personal or private materials, *id.* § 105–63.401(a); and materials containing statements violative of the privacy rights of others, *id.* §§ 105–63.402–1(b), 105–63.402–2(a), (b)(2). The regulations contain no counterpart to the donor-imposed restriction on

materials "containing statements made by or to a President in confidence," 433 U.S. at 497 n.3, 97 S.Ct. at 2817 n.3, but they allow anyone to assert any constitutional or legal privilege implicated by such statements. 41 C.F.R. § 105–63.401–1(a) (1980).

**16.** His claim that less intrusive means were available to the Administrator leads Mr. Nixon to a related argument. He contends that the Administrator, when drafting the regulations, gave insufficient consideration to these alternatives. Because Congress wanted the Act to be implemented in a constitutional manner, this inadequate consideration, Mr. Nixon argues, fell short of the Administrator's duty to consider all relevant factors, as required of agency action by the Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As is clear from our discussion of the less intrusive alternatives suggested by Mr. Nixon,

In addition to arguing that his proposals represent less intrusive means of accomplishing the Act's objectives, Mr. Nixon claims that only some more restrictive form of access will respect what the Supreme Court recognized as the "presumptive" nature of the privilege. *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974). The challenged regulations are deficient in that regard, he charges, because they place upon him the burden of coming forward to challenge any disclosure that he thinks will violate the privilege. To remedy this deficiency, he proposes that the regulations include (1) a requirement that would-be listeners show "particularized need" for hearing the tapes, thus removing from Mr. Nixon the burden of challenging each disclosure; (2) a requirement that archivists affirmatively identify and segregate material implicating the privilege, much like the regulation requiring archivists affirmatively to restrict material falling within certain categories; or (3) a blanket time restriction.

We disagree that the presumptive nature of the privilege requires adoption of any of these features. In *Nixon v. Administrator,* the Supreme Court rejected the argument that archival screening "reversed" the presumptive privilege, noting that the Act required the Administrator to preserve Mr. Nixon's right to assert the privilege. The Act's guidelines, the Court observed, were on their face "as broad as the privilege itself." 433 U.S. at 455, 97 S.Ct. at 2796. The same observation applies here; the regulations give Mr. Nixon the opportunity to challenge any disclosure on the basis of the privilege.

Mr. Nixon's proposals add nothing required by the presumptive privilege, even if we assume the existence of some cumulative effect of disclosure that cannot be easily challenged on an individual basis. It is true that the regulations do not contain a specific restriction requiring the archivists to segregate materials implicating the privilege, and that Mr. Nixon must assert the privilege on a disclosure-by-disclosure basis. But we think that this feature of the regulations is justified by the very nature of the privilege. Whether particular material implicates the privilege depends on whether disclosure will affect the flow of executive discussion, a complex judgment best made by the incumbent President. *Id.* at 449, 97 S.Ct. at 2793. We cannot see how the Administrator could have devised meaningful fixed criteria allowing archivists to make that difficult judgment.

We also see no justification for requiring the Administrator to condition access upon a showing of particularized need. We do not understand "presumptive" to mean that all the tapes in the Administrator's custody must be presumed fully to implicate the privilege, and that would-be listeners must override that presumption with a showing of need. Rather, we think that those who see in disclosure a threat to the privilege must be given a meaningful opportunity to contest disclosure on that basis. The regulations give Mr. Nixon such an opportunity. He can raise a challenge by sending a letter to the Administrator explaining his position; only if his claim is rejected administratively need he present his claim in court. Moreover, recalling the Supreme Court's observations about the incumbent's superior ability to perceive threats to the privilege, *id.,* the Executive Branch may well raise a challenge when such threats appear, thereby alleviating Mr. Nixon's burdens.

IV

■ Before addressing Mr. Nixon's challenge to what he foresees as a "word-by-

the regulations are not defective in failing to include the features he suggests. Mr. Nixon seems to argue, nonetheless, that the Administrator violated the Act simply because he quickly rejected delayed public access as an alternative. Not only do we question the validity of Mr. Nixon's legal premise, *see United States v. Morgan,* 313 U.S. 409, 421–22, 61

S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941), we find no fault in the Administrator's drafting the regulations with an eye toward providing public access to materials as soon as it is determined that disclosure of those materials will not violate any constitutional or legal right or privilege.

word" archival screening of his personal diary tapes, it is important to understand how that diary was created and stored, because those details are of considerable importance to Mr. Nixon's legal claims. During certain periods of his Presidency, from November 1971 until April 1973, and again in June and July 1974, it was Mr. Nixon's practice to dictate onto portable dictabelts or cassettes a verbal diary of the day's events. Affidavit of Richard M. Nixon, J.A. 226 [hereinafter "Nixon Affidavit"]. Although this dictation often consisted of personal reflections on activities relating to his official duties, he did not make this record to aid him in performance of those duties. Rather, he viewed the dictations as purely personal records. *Id.* at 227.

From November, 1971, until sometime in 1973, Mr. Nixon always dictated onto magnetic dictabelts, and always started each diary entry on a new dictabelt. He never dictated his diary onto dictabelts that also contained official dictation. *Id.* In 1973 Mr. Nixon began to dictate onto a portable cassette tape recorder, a practice that allowed him to include on a single cassette more than one day's dictation. Even after switching to the use of cassettes, however, Mr. Nixon continued to dictate intermittently onto dictabelts. *Id.*

Mr. Nixon states that he "began each dictation in a way which would readily distinguish it from other documents and memoranda that [he] also put on dictabelts." *Id.* He did not, however, always employ the same distinguishing feature. According to Mr. Nixon, some of his diary dictations were distinguishable from official dictation only by the absence, rather than the presence, of certain phrases. For example, if dictating an official memorandum to his chief of staff, Mr. Nixon would begin the dictation with the phrase, "This is a memorandum to Bob Haldeman," or with other "words to that effect." *Id.* at 227–28. His diary entries are distinguishable, he says, because they contain no such prefatory statements. *Id.* at 228. In addition, some of the diary dictations began with "a statement of the date followed by the beginning of a recitation of events." *Id.*

As Mr. Nixon continued to make these diaries, he began "with greater regularity to preface them with opening remarks designating them as private." *Id.* These remarks, too, varied slightly. He might state, "March 9, 1972. Memorandum for the private file—not to be transcribed," or "Dictated for file, not to be transcribed—at Camp David on Saturday afternoon, January 6, 1973." *Id.* Apparently the time of day noted in these introductory phrases varied slightly, because not all his diary dictations were made at the end of the day. *Id.* at 226.

Mr. Nixon then would hand these dictabelts directly to his secretary, indicating in some way that the tape belonged to his private file. He would either note verbally that the dictabelts were private, or attach a note to the dictabelt itself designating it as private. *Id.* at 228.

Sometimes Mr. Nixon dictated diary entries in the Oval Office and the Executive Office Building. Because those areas had room recording devices triggered automatically by voice, some of Mr. Nixon's diary dictations were also recorded by that taping system. *Id.*

As the Supreme Court noted in *Nixon v. Administrator*, the Presidential materials are in a commingled state. 433 U.S. at 459, 97 S.Ct. at 2798. Because Mr. Nixon used dictabelts to record official as well as personal matters, the mere physical features of dictabelts do not serve to distinguish diary from nondiary materials. At the time of the District Court's entry of judgment, the archivists had uncovered some 624 dictabelts either containing dictation by Mr. Nixon or located in files attributed to him. Jacobs Affidavit, J.A. 293. As we explained earlier, the archivists at the time of trial had completed "Phase I" processing of these dictabelts; that is, the dictabelts had been rewound, duplicated, and monitored for sound quality only. The archivists have voluntarily held in abeyance, until the outcome of this litigation, further processing of the dictabelts. They have, however, continued to process the cassettes, as well as the

tapes made by means of the office taping system. These cassettes and tapes are also alleged to contain some of Mr. Nixon's diary dictations.

The parties are in agreement that, once diary material is identified by means of archival processing, the archivists must return the material immediately to Mr. Nixon. The regulations require no less, stating that the archivists, in processing the materials, are to give priority to segregating and returning private materials to their owner. 41 C.F.R. § 105–63.401(a) (1980). The parties disagree, however, on the constitutionality *vel non* of the processing procedure by which the archivists propose to identify the diary material. Indeed, the parties differ even in their descriptions of that procedure. For that reason, we will outline the contested procedure with some care.

The archivists essentially propose to review the dictabelts and other tapes in the detail necessary to ascertain whether the dictabelt or tape constitutes a personal diary. Brief of Appellee Administrator of General Services, at 27 n.6; Jacobs Affidavit, J.A. 296–97. If an introductory phrase or certain portions of a tape reveal the tape to be a diary, the archivists will not review the tape further. *Id.* The archivists acknowledge, however, that at times they may find it necessary to undertake a word-by-word review of dictabelts that may, as a result of the review, be identified as diaries. *Id.* Presumably their judgment as to the necessary scope of review will be guided by the requirement to "take all reasonable steps to minimize the degree of intrusion into private or personal materials." 41 C.F.R. § 105–63.401–2(a) (1980).

Because this screening will be of the scope necessary to identification of the diaries, the description of the screening procedure requires some statement of what the archivists consider to be a private diary protected by the regulations and the Fourth Amendment. Whether a particular tape constitutes such a diary, of course, can be determined only on a case-by-case basis. Judicial consideration of challenges to particular characterizations, moreover, will

clarify the criteria that determine whether given material is a private personal diary. But because the scope of archival screening will depend in part on what definition of diary the archivists employ, our explanation of the screening procedure requires us to consider at least any general definition that the archivists will employ when screening the tapes.

The regulation governing archival screening of the dictabelts requires the archivists to segregate "private or personal" materials and transfer them to their owner. *Id.* § 105–63.401(a). "Private or personal" materials are defined as those "relating solely to a person's family or other nongovernmental activities, including private political associations, and having no connection with his constitutional or statutory powers or duties as President ...." *Id.* § 105–63.-104(b).

We assume that the archivists, in acting under this definition, will heed the comments of the Government and Justice White at oral argument in *Nixon v. Administrator.* There the Government conceded, and Justice White emphasized, that material can constitute a private diary even if it contains matters of general historical significance. 433 U.S. at 488 & n.*, 97 S.Ct. at 2811. (White, J., concurring). Reading the definition of "personal or private" in light of this insight, we assume, and were assured at oral argument by the intervenor-appellees, that the archivists will not act according to a definition that would deny diary classification to a purely personal tape simply because the tape recounts some events related to a President's official duties.

Materials subject to this initial screening procedure will be classified as personal or private diaries only if two archivists agree on that classification. Nixon Materials Archival Processing Manual, J.A. 161–62 & n.1; Brief of Appellee Administrator of General Services, at 27 n.7. If two are unable to agree, or feel that the classification raises significant questions of interpretation, they may refer the matter to the Senior Archival Panel, which may in turn

refer it, if necessary, to the Presidential Materials Review Board. 41 C.F.R. § 105–63.401–2(d)–(e) (1980).

Mr. Nixon characterizes this screening procedure as a "word-by-word" review of all his diary materials. He is correct in the sense that the archivists' proposed method allows them the freedom to undertake such a review when they consider it necessary to identification of· diary material. But each diary entry begins with a "triggering phrase," Mr. Nixon contends, and the archivists can identify his diary simply by listening for those phrases. Any single archivist's word-by-word review, therefore, violates his privacy rights guaranteed by the Fourth Amendment, a violation aggravated by the multiple screening that any final determination requires.

Before evaluating the archivists' proposed procedure, it is useful to understand how Mr. Nixon's claim here differs from his claim in *Nixon v. Administrator*, where the Court determined that archival screening of all the Presidential materials, which were acknowledged to contain diaries and other private materials, did not violate the same privacy interests on which he now relies. *Nixon v. Administrator* does not settle the issue in this case because the Court there considered only the Act's facial validity, and did not specifically hold valid this form of archival screening. But critical to the Court's decision was the fact that private and nonprivate materials were commingled, requiring archival review of all the materials to some degree. 433 U.S. at 463–65, 97 S.Ct. at 2800–01. Here Mr. Nixon claims that a particular identifying feature can separate certain types of private material from the rest of the materials, and that use of this feature represents the broadest screening procedure that is constitutionally permissible.

The Court's analysis in *Nixon v. Administrator* is, nonetheless, highly relevant to the claim Mr. Nixon now presses. Recognizing that some of the Presidential materials, such as diaries, fully implicate Mr. Nixon's privacy rights, the Court judged the legality of archival screening according to its reasonableness. *Id.* at 460, 97 S.Ct. at 2798. Screening furthered the important congressional interest in preserving an "accurate and complete historical record." *Id.* at 452 n.14, 97 S.Ct. at 2794 n.14 (quoting 408 F.Supp. at 349). The resulting infringement on Mr. Nixon's privacy rights was reasonable, the Court found, in large part because the mingling of private and nonprivate materials made achievement of that congressional goal impossible without some screening of all the materials, and because the nonprivate nature of the bulk of materials minimized the intrusiveness of the screening. *Id.* at 465, 97 S.Ct. at 2801.

The reasonableness of the processing method now challenged by Mr. Nixon, it seems clear, largely depends on whether the method is necessary to identifying what is diary material and what is not. If reliance on trigger phrases alone can provide certain identification, then broader screening serves no legitimate interest and only intrudes further on Mr. Nixon's privacy rights. We stress the need for sure identification because we think the Act justifiably requires no less. Congress desired to preserve an accurate and complete historical record, and delegated to "trusted and disinterested" archivists, *id.* at 453, 97 S.Ct. at 2795, large responsibility for carrying out that goal. We cannot remove that responsibility from the archivists unless exclusive use of Mr. Nixon's trigger phrases presents no risks of unreliable or incomplete identification.

We are aware, of course, that we cannot uphold the District Court's grant of summary judgment against Mr. Nixon's diary claim if there is any genuine issue of material fact relevant to that claim. We can uphold the District Court only if, upon viewing the relevant evidence in the light most favorable to Mr. Nixon, we can conclude that the Administrator was entitled to judgment as a matter of law. In addition, we bear in mind that decision by summary judgment is disfavored when additional development of facts might illuminate the issues of law requiring decision. 10 C. Wright & A. Miller, Federal Practice and Procedure § 2725, at 501 (1973).

Mr. Nixon's own account of both his dictating procedure and the contents of the diary tapes requires us to conclude that the archivists' proposed procedure is not an unreasonable infringement of his privacy rights. Even the careful dictating procedure he describes cannot serve to identify diary materials with enough certainty to justify removing from the archivists their screening and identifying obligations under the Act. First, Mr. Nixon makes it clear that no single trigger phrase prefaces all diary entries. Rather, he varied the phrases over the course of time. More damaging to his claim that the trigger phrases provide certain identification, however, is his description of the feature that supposedly identifies the earlier diary materials. The archivists can recognize those dictations, he states, by the absence of the types of introductory phrases that marked his official, nondiary dictation. In other words, the archivists are to cease processing any dictation that does not begin with a phrase akin to "This is a memorandum to Bob Haldeman." We have no difficulty concluding that the absence of such a phrase gives no clear assurance that what follows is diary material. Without such an assurance, we cannot view as unreasonable the archivists' insistence upon not being restricted to that alleged identifying feature.

Mr. Nixon claims that his later diaries begin with less ambiguous identifying phrases, usually a statement that what followed was for the private file and was not to be transcribed. Presumably he would ask us to restrict the archivists to use of this phrase when it appears, even if they cannot be restricted to use of the vaguer trigger phrase. But given Mr. Nixon's own account of the variations in his trigger phrases and of his failure, in general, methodically to follow any set system in keeping his diary, we cannot conclude that even the less ambiguous preface possesses sufficient reliability in the circumstances to relieve the archivists of their responsibilities under the Act.

## V

As we recounted earlier, the District Court limited certain discovery efforts that Mr. Nixon attempted after he filed his motion for partial summary judgment in accordance with the schedule approved by the court. Mr. Nixon claims that these limitations represent an abuse of discretion because they prevented him from developing facts necessary to resolution of the issues now on appeal.

A district court has broad discretion over the scope of discovery. 8 C. Wright & A. Miller, Federal Practice and Procedure § 2036, at 267–68 (1970). At the same time, however, a district court must not grant a motion for summary judgment if any genuine issue of material fact exists, and the court's broad power over discovery cannot excuse a grant of summary judgment in the face of such an issue of fact. Because our consideration of Mr. Nixon's claims has been guided by our duty to remand if any genuine issues of fact exist, much of our answer to this final claim is implicit in our determination that the District Court did not err in granting defendants' motions for partial summary judgment. A fuller description of Mr. Nixon's discovery efforts should make more clear our conclusion that the District Court acted within its discretion.

Mr. Nixon's allegations center on three orders of the District Court: (1) the November 2, 1977, protective order postponing further discovery in connection with Mr. Nixon's first amended complaint, thereby preventing him from deposing the Archivist of the United States and the Administrator with respect to that complaint, J.A. 12; (2) the May 29, 1979, order denying Mr. Nixon's motion for leave to depose Robert Lipshutz, White House Counsel, J.A. 15; and (3) the June 25, 1979, order quashing the subpoenas served on Dr. James B. Rhoads, Archivist of the United States, and Richard A. Jacobs, Deputy Assistant Archivist, J.A. 16.

The first of these orders related to discovery in connection with Mr. Nixon's first amended complaint, which was superseded by a second and then a third amended com-

plaint. The third amended complaint was filed to implement the February 14, 1979, settlement agreement, and the court granted summary judgment with respect to that complaint. The second and third order described above limited discovery relating to the third amended complaint.

To place these orders in perspective, it is helpful to note the timing of the discovery efforts they denied. The request underlying the first order occurred long before Mr. Nixon filed his final complaint. The second and third orders were in response to discovery efforts made by Mr. Nixon after he had filed his motion for partial summary judgment on his final complaint. In addition, the third order denied a request made after all parties had filed motions for partial summary judgment. All of these motions for partial summary judgment were filed in accordance with a schedule submitted by Mr. Nixon and agreed upon by the parties. The schedule called for "limited" discovery "reasonably necessary for the filing of dispositive motions," J.A. 190, a limitation underscored by the suggested period of only five days in which to respond to discovery requests. *Id.* At the time Mr. Nixon moved for partial summary judgment, he had received responses to all the discovery requests that he had made since the settlement.

Mr. Nixon nonetheless asserts now that his discovery efforts sought facts whose absence in the record invalidates the court's decision by summary judgment. Upon inspecting his arguments and his "Offer of Proof" filed with the District Court, J.A. 389, we cannot agree. With respect to the first order, Mr. Nixon contends that the court should have allowed direct questioning of the Administrator as to his decisionmaking process, including whether political pressures shaped his decision to provide direct access to the tapes. We have already explained why the regulations' public access scheme comports with the Act and the Constitution, and we question the legal relevance of attempting to demonstrate that political factors played a part in the Administrator's decisionmaking process. *See* note 16 *supra.* Moreover, Mr. Nixon had and

took the opportunity, after the settlement and the filing of the third amended complaint, to seek discovery from the Administrator, J.A. 201–07, and to those requests Mr. Nixon received responses, J.A. 212–23.

We are also unpersuaded that the District Court erred in rejecting Mr. Nixon's attempt to depose Robert Lipshutz, White House Counsel. Mr. Nixon's Offer of Proof states that this belated inquiry could have revealed that then-incumbent White House officials opposed the listening center concept, and that then-President Carter had not personally approved the listening center regulation. J.A. 390. But these or similar showings would not alter our conclusion that the Administrator devised a system for public access that does not violate the Constitution.

According to Mr. Nixon, his even later attempt to serve subpoenas on the Archivist and Deputy Assistant Archivist was necessary to contradict the affidavit of the Deputy Assistant Archivist, which the Administrator filed in support of his motion for partial summary judgment. Appellant's Brief, at 46. The portions of the affidavit contested by Mr. Nixon question the existence and reliability of trigger phrases in the diary tapes. We looked no further than Mr. Nixon's own affidavit, however, in concluding that the Administrator may constitutionally go beyond use of such phrases in appropriate cases. For the same reason, we may disregard Mr. Nixon's offer to discredit statements contained in the affidavit of Richard Ben-Veniste, J.A. 390, which the intervenor-defendants filed in support of their cross-motion for partial summary judgment, J.A. 339.

Finally, we cannot agree that the District Court should have allowed the subpoenas because they would have revealed mishandling by the National Archives of "many valuable items," J.A. 390, or agreement by the National Archives to a fifty-year restriction on the tape recordings of President Johnson, *id.* The constitutionality *vel non* of the public access regulation does not turn on the methods by which

materials accumulated during prior Presidential terms were stored and made available to the public.

## VI

After considering Mr. Nixon's constitutional objections to the regulations promulgated by the Administrator, we conclude that the District Court correctly held that defendants were entitled to judgment as a matter of law. Neither do we find any abuse of discretion by the District Court in denying Mr. Nixon's motions for further discovery. Accordingly, the judgment of the District Court is affirmed.

*It is so ordered.*