**PUBLIC CITIZEN, et al.**

v.

**Frank BURKE, Acting Archivist, National Archives & Records Administration, et al., Appellants,**

**Richard M. Nixon.**

**PUBLIC CITIZEN, et al.**

v.

**Frank BURKE, Acting Archivist, National Archives & Records Administration, et al.**

**Appeal of Richard M. NIXON.**

Nos. 87–5194, 87–5215.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1988.

Decided April 12, 1988.

---

Samuel A. Alito, Jr., U.S. Atty., Newark, N.J., with whom Michael Carvin, Deputy Asst. Atty. Gen., was on the brief, for federal appellants.

R. Stan Mortenson, with whom Herbert J. Miller, Jr., Washington, D.C., was on the brief, for appellant Richard M. Nixon.

Eric R. Glitzenstein, with whom David C. Vladeck and Alan B. Morrison, Washington, D.C., were on the brief, for appellees.

Before SILBERMAN and SENTELLE, Circuit Judges, and HAROLD H. GREENE,[*] Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case involves a challenge to regulations issued under the Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA"), note following 44 U.S.C. § 2111 (1982). In March of 1985, the Archivist of the United States, the official charged with custody of the materials of former President Nixon, published regulations governing disclosure of certain of these materials. The Justice Department opined that the regulations must be "interpreted" for constitutional reasons as obliging the Archivist to acquiesce in *any* claim of executive privilege asserted by the former President to block disclosure of materials, and the Archivist has adopted that interpretation.

Appellees, Public Citizen, Reporters Committee for Freedom of the Press, and writer David A. Bollier challenged that interpretation successfully in the district court, and the government appeals. Since the Archivist's regulations, as interpreted by the Justice Department, are premised on what we believe is a misunderstanding of the Constitution, we agree with the district

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

court that the agency's regulations cannot be upheld with the gloss placed upon them by the Justice Department. *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). The district court, 655 F.Supp. 318, is therefore affirmed.

## I.

The Nixon Papers Act has engendered much litigation since its passage in 1974. *See Nixon v. General Servs. Admin.,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Nixon v. Freeman,* 670 F.2d 346 (D.C.Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982); *Allen v. Carmen,* 578 F.Supp. 951 (D.D.C.1983). The principal intent of Congress in passing PRMPA was to maintain a publicly available historical record of the Nixon presidency by gaining control over some 42 million pages of documents and 880 tape recordings from former President Nixon by in effect abrogating Mr. Nixon's depository agreement with Arthur F. Sampson, Administrator of the General Services Administration ("GSA"). H.R.Rep. No. 1507, 93d Cong., 2d Sess. 2–4 (1974). The Nixon–Sampson Agreement, announced on September 8, 1974, the day then President

Ford pardoned Mr. Nixon, gave former President Nixon "all legal and equitable title" to the materials, the power to control access to the materials, the right to withdraw any portion of the materials after three years, and the assurance that all tape recordings would be destroyed upon Mr. Nixon's death or September 1, 1984, whichever was earlier. *See Nixon v. Sampson,* 389 F.Supp. 107, 160–62 (D.D.C.1975) (App. A., Nixon–Sampson Agreement).

Congress entrusted the Administrator of the GSA with custody of the Nixon materials—an action the Supreme Court subsequently upheld as not unconstitutional, at least on its face. *Nixon v. General Servs. Admin.,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. Although the Administrator was replaced by the Archivist in 1984 as the official in charge of the materials,[1] the Act and its goals have remained largely intact. PRMPA requires the Archivist to promulgate regulations for public access, taking into account seven factors ranging from the "need" to disclose information about "Watergate" to the "need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access." PRMPA § 104(a).[2] Congress

---

1. In 1984, Congress established the National Archives and Records Administration ("NARA") as an independent agency within the Executive Branch to administer the presidential papers and tape recordings of Mr. Nixon and to supervise the screening, processing, and preparation of those materials for public access. National Archives and Records Administration Act of 1984, 44 U.S.C. §§ 2101–2118 (Supp. II 1984). Congress provided that the Archivist be appointed by the President, with the advice and consent of the Senate, be removable by the President, and that the Archivist "shall be appointed without regard to political affiliations and solely on the basis of professional qualifications." 44 U.S.C. § 2103(a). Congress' intent was to ensure that "archival and records management decisions would be made on a professional basis unaffected by political considerations or other extraneous factors." S.Rep. No. 373, 98th Cong., 2d Sess. 13 (1984) U.S.Code Cong. & Admin. News 1984, 3865, 3877; *see also* H.R.Conf.Rep. No. 1124, 98th Cong., 2d Sess. 20 (1984).

2. Section 104(a) requires in full:
   The Archivist shall, within ninety days after the date of enactment of this title, submit to each House of the Congress a report propos-

ing and explaining regulations that would provide public access to the tape recordings and other materials referred to in section 101. Such regulations shall take into account the following factors:
   (1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";
   (2) the need to make such recordings and materials available for use in judicial proceedings;
   (3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings to information relating to the Nation's security;
   (4) the need to protect every individual's right to a fair and impartial trial;
   (5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;
   (6) the need to provide public access to those materials which have general historical significance, and which are not likely to be

intended PRMPA to "provide the public with the full truth, at the earliest reasonable date, of the abuses of government power" during the "Watergate" period. H.R.Rep. No. 1507, 93d Cong., 2d Sess. 1–3 (1974). In order to protect its interest in disclosure, Congress at first enacted a legislative veto provision in § 104(b), but after *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) held unconstitutional Congress' use of the one-House veto, it settled on a requirement that the regulations not take effect until sixty days after their submission to Congress, PRMPA § 104(b) (Supp. II 1984).

Under the current, sixth set of regulations,[3] the Archivist prepares the Nixon materials for public access by organizing them into "integral file segments," which are "intelligible and complete unit[s] for purposes of historical research." *Freeman,* 670 F.2d at 352 n. 11. Access is tempered, however, by the Archivist's segregation of certain restricted materials: for example, materials that are private or that neither relate to "abuses of power" nor have general historical significance are not released. 36 C.F.R. § 1275.46(b) (1987); *see also id.* § 1275.50(a) (no access if release of Watergate materials would violate a federal statute or is subject to a claim of privilege); *id.* § 1275.52(b) (no access if release of non-Watergate materials would disclose trade secrets or constitute libel or an invasion of personal privacy).

Once a segment is fully prepared, the Archivist is obliged to publish in the Federal Register notice of his intent to provide public access. *Id.* § 1275.42(b). This notice must identify the materials to be made public and also apprise any interested person that he is entitled to assert a legal or constitutional right or privilege to halt access. Those who are to receive special notice include former President Nixon and any individual whose name appears in the materials. If there is a complaint protesting disclosure, the interested individual may file his objection with the Archivist, who, according to the language of the regulations, is responsible for the decision in those cases involving claims of privilege. *Id.* § 1275.44(a).

Before publication of this sixth version of the regulations, the Archivist, pursuant to Executive Order No. 12,291, forwarded the regulations to the Office of Management and Budget ("OMB") for clearance. OMB in turn requested the views of the Justice Department's Office of Legal Counsel ("OLC") as to whether the proposed regulations adequately honored § 104(a)(5) of PRMPA concerning claims of privilege. OLC responded by memorandum asserting that the language of the regulations—insofar as they authorized the Archivist to determine the merits of an assertion of executive privilege—would not be consistent with the Constitution. According to OLC, if either an incumbent President or former President Nixon were to assert executive

related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

**3.** The first three sets of regulations were rejected by Congress, using its one-House legislative veto. *See Nixon v. Freeman,* 670 F.2d at 349 n. 4. The fourth set of regulations became effective December 16, 1977, 42 Fed.Reg. 63,626, but they were later modified in 1980 pursuant to a settlement agreement with former President Nixon. *Freeman,* 670 at 349–50. The fifth set became effective on March 7, 1980. 45 Fed.Reg. 14,856 (1980). They survived an initial attack by President Nixon in *Freeman,* but they were ultimately struck down as poisoned by the Act's

legislative veto provision. *Allen v. Carmen,* 578 F.Supp. 951 (D.D.C.1983). On March 29, 1985, the Archivist, with the blessing of the specially empaneled Nixon Materials Regulations Review Group, filed a notice of proposed rulemaking, announcing his intention essentially to repromulgate the fifth set of regulations. 50 Fed.Reg. 12,575. After the close of the comment period, the Civil Division of the Justice Department reviewed the regulations and proposed no significant changes. *See Review of Nixon Presidential Materials Access Regulations: Hearings Before a Subcomm. of the House Comm. on Gov't Operations,* 99th Cong., 2d Sess. 176, at 256 (1986) (Letter from Richard K. Willard, Acting Assistant Attorney General Civil Division to Gary L. Brooks, Acting General Counsel National Archives (July 19, 1985)). This sixth set of regulations became effective June 26, 1986 and is the subject of this appeal.

privilege with respect to any document or group of documents, the Archivist would be obliged to honor that claim and a requester could only challenge the assertion of executive privilege in federal court.

The Archivist did not formally modify the regulations to conform to OLC's view, but has, since publication, indicated his determination to conform fully to the Justice Department's opinion. Testifying before Congress, the Archivist, Dr. Frank G. Burke, said "Because approval by the [OMB] of our regulations was conditioned upon the Department of Justice opinion and because the Department of Justice represents the National Archives in all litigation, we consider the opinion binding upon our administration of the Nixon materials." *Review of Nixon Presidential Materials Access Regulations: Hearing Before a Subcomm. of the Comm. on Gov't Operations,* 99th Cong., 2d Sess. 176, at 43 (1986) (testimony of Frank G. Burke, National Archivist); *see also* Letter from Frank G. Burke to Hon. Thomas P. O'Neill (Feb. 26, 1986) (reporting the final set of PRMPA regulations with OLC memorandum interpretation).[4] All parties to this litigation agree that the regulations have essentially been modified to accord with the Justice Department's views and it is as modified that they were challenged in the district court by appellees.[5]

## II.

The statute is not explicit as to whether Congress intended the Archivist to determine himself the merits of a claim of executive privilege. We therefore must consider whether the government's construction of the statute is entitled to deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694

(1984). Appellees argue that deference would be manifestly inappropriate here since Congress originally delegated its interpretation to GSA and subsequently, to ensure professional non-partisan implementation, to the Archivist. And, as is quite clear, the Archivist did not originally interpret the statute as the Justice Department would wish; in fact, the Archivist does not explicitly embrace OLC's view, he only acquiesces in OLC's opinion.

The doctrine of administrative law obliging the Judiciary to defer to an administrative agency's interpretation of a statute the agency is charged with enforcing does in part, as appellees suggest, rest on the assumption that a specific agency's expertise is greater than the court's—and therefore *that* agency is likely to understand congressional purpose, in the zone of its expertise, more profoundly than the Judiciary. But deference is required also because the Executive Branch, populated by political appointees, is thought to have greater legitimacy than the non-political Judiciary in resolving statutory ambiguities, in light of policy concerns, when congressional intent is unclear. *Chevron,* 467 U.S. at 864–66, 104 S.Ct. at 2792–93. Of the Executive Branch officers, the President, of course, embodies the ultimate political legitimacy and therefore his views as to the manner by which his appointees will interpret a statute may not be lightly disregarded, *see Sierra Club v. Costle,* 657 F.2d 298, 405 (D.C.Cir.1981); *see also In Re: Sealed Case,* 838 F.2d 476, 488–89 & n. 21 (D.C. Cir.1988), *prob. juris. noted sub nom. Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988).[6] Since the incumbent President, by virtue of Article II's command that he take care that the laws be faithfully executed, quite legitimately guides his subordinates' interpretations of statutes, it seems anomalous for

---

**4.** As the government's brief points out, however, the Deputy Administrator of OMB testified that while OMB expected the Archivist to follow the Justice Department's opinion, OMB had not intended to condition the issuance of the regulation on compliance with the opinion. We therefore take the government's position to be that if the Justice Department's opinion is rejected by this court, the regulations are to stand as promulgated.

**5.** Appellants agree that Public Citizen's challenge to the regulations is now ripe for review in light of former President Nixon's pending claims of executive privilege and the Archivist's expressed intention to follow the OLC memorandum.

**6.** We assume that OLC's view reflects the President's.

the Judiciary to refuse deference merely on the grounds that it can be shown that the agency's interpretation was one pressed by the President upon reluctant subordinates. *Cf. Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2792–93. Indeed, even the inquiry might raise separation of powers concerns.

██ We need not decide, however, whether appellees are correct in contending deference should not be afforded because the interpretation is not truly that of the Archivist. We agree with appellees that deference is inappropriate here for a second reason they advance; the government's administrative position is not, in any meaningful sense, an interpretation of the statute. The OLC memorandum is driven entirely by its constitutional reasoning; it makes no effort to ground its view of the statute on congressional purpose, even if such purpose is understood very broadly. *Chevron,* 467 U.S. at 843 & n. 9, 104 S.Ct. at 2781 n. 9; *SEC v. Chenery,* 332 U.S. 194, 200, 67 S.Ct. 1575, 1579, 91 L.Ed. 1995 (1947); *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am.,* 836 F.2d 599, 609 (D.C.Cir.1988). Rather, OLC's position fairly read is that the regulations must carry its gloss, otherwise, they would be unconstitutional, which of course is simply another way to say the statute would be unconstitutional if interpreted as the Archivist's regulations (without OLC's gloss) do.[7] The federal Judiciary does not, however, owe deference to the Executive Branch's interpretation of the Constitution. *See United States v. Nixon,* 418 U.S. 683, 703–05, 94 S.Ct. 3090, 3105–06, 41 L.Ed.2d 1039 (1974).

██ The government's constitutional argument is essentially this: An executive privilege claim could be raised by the incumbent President to release any of the Nixon papers. In that event, it is wholly inconsistent with Article II to contemplate the Archivist, an appointee of the President, independently determining whether the President's claim is meritorious. The Archivist would instead be obliged to honor the claim of his constitutional superior. Since, moreover, a former President retains his right to claim executive privilege, *Nixon v. General Servs. Admin.,* 433 U.S. at 448–49, 97 S.Ct. at 2792–93, it follows according to the government that the Archivist must afford him the same deference that he gives the incumbent President: "[J]ust as we believe . . . that the Archivist must and will honor any claim of executive privilege asserted by an incumbent President, we believe that the Archivist must and will treat any claim by a former President in the manner outlined in this opinion." Assuming arguendo that the government is correct in its premise—we recognize its argument on that point is powerful —its conclusion does not follow. Ronald Reagan, not Richard Nixon, is the constitutional superior of the Archivist. Ronald Reagan has the constitutional power to direct the Archivist, not Richard Nixon.

The OLC memorandum acknowledges, indeed insists, that in the event there were to be disagreement between an incumbent President and former President Nixon as to whether documents should be disclosed (the disagreement could involve the incumbent President favoring either disclosure or non-disclosure) the Archivist would be obliged to follow the direction of the incumbent. To be sure, OLC believes an incumbent President *should* honor the claims of executive privilege interposed by a former President, but that is argued seemingly as a question of policy, not law, because OLC recognizes "this principle must yield when it conflicts with the discharge of the incumbent's constitutional responsibilities." It may well be, as OLC observes, that a former President's privilege is diminished if an incumbent President sits "as judge" of the validity of the claim, but that seems an overstatement of the effect of the regulations. After all, even if the incumbent President were to determine that certain documents over which former President

---

**7.** We also note that the OLC interpretation abruptly departs from the uniform prior interpretation by GSA and the Archivist, under which the Archivist had the initial responsibility to decide individual claims of executive privilege by the former President. *See Freeman,* 670 F.2d at 359.

Nixon asserted executive privilege should be disclosed in order to satisfy the incumbent President's constitutional responsibilities in the event Mr. Nixon brought suit to stop disclosure, a federal court would do the "judging."

In short, since the incumbent President is not constitutionally obliged to honor former President Nixon's invocation of executive privilege with respect to the Nixon papers, we see no reason why the Archivist—an appointee of the incumbent President—is himself constitutionally compelled to afford any more deference to Mr. Nixon's claim than would be the incumbent President. OLC's discomfort with the role that the Archivist would play under the regulations as written suggests more notions of lèse majesté than unconstitutionality.

We find no support for OLC's constitutional argument in *Nixon v. General Services Administration*. The Supreme Court recognized that an incumbent President—as opposed to a former President—is in the "best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly." 433 U.S. at 449, 97 S.Ct. at 2793. Indeed, former Presidents' "expectations of the confidentiality of executive communications" is understood to erode over time. *Id.* at 451, 97 S.Ct. at 2794; *Freeman*, 670 F.2d at 356. That suggests, therefore, that an incumbent President, aided perhaps by his close subordinates, must exercise some discrimination and judgment with respect to a former President's assertion of executive privilege if he wishes to support it. To say, as does OLC, that Mr. Nixon's invocation of executive privilege cannot be disputed by the Archivist, a sub-ordinate of the incumbent President, but must rather be evaluated by the Judiciary in the first instance is in truth to delegate to the Judiciary the Executive Branch's responsibility as set forth in the statute and the accompanying regulations. It may well be unpleasant for the Executive Branch to be forced to consider the host of difficult questions that arise in this area, and the statute may place the incumbent President in an awkward position by obligating him to take a position on claims of executive privilege put forward by former President Nixon. Nonetheless, since the Archivist is part of the Executive Branch, we do not see how the incumbent President's responsibility to take care that the laws be faithfully executed can properly be transferred to the Judiciary.[8]

The Archivist may well not be particularly qualified *by himself* to evaluate former President Nixon's claims of executive privilege, but we see no reason why the incumbent President cannot ensure adequate consultation with his Justice Department—perhaps OLC—to enable the Archivist to make appropriate determinations. *See* 36 C.F.R. § 1275.44(c) (Archivist may consult with other appropriate federal agencies in making his determinations regarding a claim of privilege). And the Archivist will be knowledgeable, as appellees emphasize, as to what information is already disclosed and therefore will be, if properly advised as to constitutional matters, uniquely suited to expressing the Executive Branch's determination on such claims.

Finally, our conclusion that OLC's modification of the Archivist's regulations is not constitutionally compelled is consistent with our prior opinion in *Nixon v. Free-*

---

**8.** Appellant Nixon also claims that the Archivist's determination of his claim in the first instance creates an unconstitutional delegation to non-Article III officers, as in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (opinion of Brennan, J.). But unlike *Marathon,* where Congress had created a bankruptcy court in each judicial district as an adjunct to the district court, placing the initial determination of claims concerning the documents in the Archivist does not disturb our constitutional scheme whereby essential attributes of the judicial power reside in only Article III tribunals. *Id.* at 77 & n. 29, 102 S.Ct. at 2874 & n. 29. As we have stated earlier, the Archivist does not exercise "judicial power" when he treats claims of executive privilege by Mr. Nixon, but rather he merely makes, as the OLC memorandum itself describes it, an "administrative decision"—concerning the public release of documents within the government's possession. Unlike the judges of the bankruptcy court in *Marathon,* the Archivist is *not* vested with the various powers of a court of equity, law, or admiralty (*e.g.,* jury trials, habeas corpus, and issuance of writs). 458 U.S. at 54–55, 102 S.Ct. at 2862–63.

*man,* 670 F.2d 346 (D.C.Cir.1982). There the fifth set of regulations was challenged in part because, like the sixth set prior to OLC's memorandum, it required former President Nixon to assume the burden of coming forward to challenge any particular disclosure that he thought would violate executive privilege. Mr. Nixon argued that the Archivist was obliged to identify and segregate material implicating the privilege to reduce the burden on the former President to examine all disclosures to determine whether he should assert a privilege. We rejected that argument, holding that Mr. Nixon must assert the privilege on a disclosure-by-disclosure basis and only after that assertion should the Archivist focus on the issue. *Freeman,* 670 F.2d at 359. We also rejected Mr. Nixon's claim, similar, if not identical, to the one presented here, that a requester must show a particularized need for sought documents:

> Rather, we think that those who see in disclosure a threat to the privilege must be given a meaningful opportunity to contest disclosure on that basis. The regulations give Mr. Nixon such an opportunity. He can raise a challenge by sending a letter to the Administrator explaining his position; *only if his claim is rejected administratively need he present his claim in court.*

*Freeman,* 670 F.2d at 359 (emphasis added). Clearly in *Freeman* we saw no constitutional anomaly in the prospect of the Archivist rejecting a challenge by Mr. Nixon based on executive privilege.

### III.

We are thus left with the question whether the OLC (the government's) "interpretation" of the Archivist's regulation is consistent with the statute. This is an issue of law concerning which, as we have explained, we afford no deference to the government's position. As such, we conclude that it is at variance with congressional purpose and therefore reject it.

Section 104(a)'s primary thrust is disclosure. Section 104(a)(5) is an exception to the statute's central purpose, but the government's construction of the regulation results in the exception looming larger than the rule. If, whenever Mr. Nixon asserts executive privilege, the Archivist in effect loses jurisdiction over his responsibilities to affect disclosure, the former President has gained power to withdraw from the Archivist some indefinite portion of the responsibilities that Congress delegated to him—and transfer those responsibilities to the Judiciary. We think that is a strained interpretation of congressional purpose, indeed one which, but for OLC's constitutional concerns, apparently would not be advanced by the government. We read the statute, as do appellees, as imposing on the Archivist the responsibility to arrange for disclosure of a category of the Nixon papers. The burden to seek disclosure is not, as is largely true of the Freedom of Information Act, 5 U.S.C. § 552 (1982), for example, placed upon the public. Of course, as § 104(a)(5) specifically provides, the Archivist must afford an "opportunity" to Mr. Nixon to *assert* his privileges, but the implication of the statute is that Mr. Nixon's assertion must be directed to that individual whom Congress entrusted with the affirmative duty to disclose. The regulations proposed by the Archivist, without OLC's modification, accomplish just that, whereas OLC's modification shifts much of the administrative responsibility to the Judiciary. We do not believe that shift reflects a correct understanding of congressional intent.

We hold, as did the district court, that the Archivist's regulations, as interpreted by the OLC memorandum, rely on an erroneous construction of the Constitution and therefore cannot be sustained. Since the government asserts in this court that the promulgation of the regulation was not *conditioned* upon the Justice Department's interpretation, there is no need to direct the district court to remand to the Archivist. The judgment of the district court approving the regulations as promulgated by the Archivist, without the Justice Department's modification, is therefore affirmed.

*It is so ordered.*