**Stanley I. KUTLER and Public Citizen, Appellees,**

v.

**John W. CARLIN, in his official capacity as Archivist of the United States, Appellant,**

**William E. Griffin and John H. Taylor, Appellees.**

No. 97–5097.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 23, 1998.

Decided March 31, 1998

Freddi Lipstein, Attorney, U.S. Department of Justice, argued the cause for appellant, with whom Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, U.S. Attorney at the time the briefs were filed, Stephen W. Preston, Deputy Assistant Attorney General, U.S. Department of Justice, and Leonard Schaitman, Attorney, Washington, DC, were on the briefs.

Scott L. Nelson argued the cause for appellees, with whom Ellen Fels Berkman, Herbert J. Miller, Jr., and R. Stan Mortenson were on the brief. Alan B. Morrison and Brian Wolfman, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge, GINSBURG and SENTELLE, Circuit Judges.

HARRY T. EDWARDS, Chief Judge:

In 1977, in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 429, 97 S.Ct. 2777, 2783, 53 L.Ed.2d 867 (1977), the Supreme Court found that the Presidential Recordings and Materials Preservation Act of 1974, 44 U.S.C. § 2111 note (1994) ("Act"), *"directs"* the Administrator of General Services [1] to take custody of the Presidential papers and tape recordings of former President Richard M. Nixon and then to promulgate regulations that provide for the return to Nixon of all materials that are "personal and private in nature." *See* 433 U.S. at 429, 97 S.Ct. at 2783 (emphasis added). In short, the Court said that, pursuant to regulations "mandate[d]" by the Act, "the Government will not even retain long-term control over such private information ... [because] purely private papers and recordings *will be returned* to appellant [Nixon] under § 104(a)(7) of the Act." 433 U.S. at 458–59, 97 S.Ct. at 2798 (emphasis added).

Five years after the decision in *Nixon v. Administrator*, this court repeated the accepted plain meaning of the Act:

---

1. In 1984, the Act was amended to indicate that the Archivist of the United States succeeded the Administrator of General Services.

The parties are in agreement that, once [personal] material is identified by means of archival processing, the archivists *must return* the material immediately to Mr. Nixon.

*Nixon v. Freeman,* 670 F.2d 346, 361 (D.C.Cir.1982) (emphasis added).

Now, more than twenty years after the Court's decision in *Nixon v. Administrator,* the Nixon estate has been forced to return to court to challenge a Government regulation purporting to allow the Archivist of the United States ("Archivist") to retain full control and possession of the entire set of the Nixon tapes. In flat defiance of what the Court said in *Nixon v. Administrator,* the Government claims that the Archivist has authority under the Act to retain, possess and control all original tape recordings, without regard to whether any portions of the tapes contain purely personal and private material. The Nixon estate counters that, when the Act is read as a whole (with a principal focus on §§ 104(a)(7) and 104(c)), along with all previous judicial interpretations of the Act, it is clear that the Nixon estate, alone, is entitled to full custody and control over tape recordings containing purely personal and private material. The Nixon estate undoubtedly has the better of this most recent disagreement between the parties.

We hold that, under the privacy protections of the Act as interpreted by the Supreme Court and this court, the Archivist must return to the estate all existing tapes and copies of conversations that do not shed light upon the Watergate affair and lack "general historical significance." § 104(a)(7). The Act strikes a delicate balance between privacy and disclosure under which President Nixon's estate is entitled to sole custody and control over recordings that are personal and private in nature. Any regulation to the contrary is unlawful under the Act. Accordingly, the Archivist must now do what the Supreme Court instructed over twenty years ago and what this court repeated sixteen years ago: "the archivists must return the material immediately to [the Nixon estate]." 670 F.2d at 361.

## I. BACKGROUND

On September 8, 1974, the day President Gerald Ford pardoned him, Nixon signed an agreement with Arthur F. Sampson, Administrator of General Services ("Administrator"), to deposit his presidential materials in a federal facility subject to a variety of provisions that gave substantial control over access and future preservation to Nixon. *See Nixon v. Administrator,* 433 U.S. at 431–32, 97 S.Ct. at 2784–85. Dissatisfied with this agreement, Congress quickly proposed and adopted the superseding Act, which President Ford signed into law on December 19, 1974. *See id.* at 432–33, 97 S.Ct. at 2784–85. As noted by the Court in *Nixon v. Administrator,* the Act directs the Archivist

> to take custody of the Presidential papers and tape recordings of appellant, former President Richard M. Nixon, and promulgate regulations that (1) provide for the orderly processing and screening by Executive Branch archivists of such materials for the purpose of returning to appellant those that are personal and private in nature, and (2) determine the terms and conditions upon which public access may eventually be had to those materials that are retained.

433 U.S. at 429, 97 S.Ct. at 2783. The disputed tape recordings consist of some 950 reels of tape, most of which contain both historically significant and purely private material. Following passage of the Act, Nixon lodged a facial challenge to its constitutionality, which the Court rejected. *See Nixon v. Administrator,* 433 U.S. at 430, 97 S.Ct. at 2783–84. However, in upholding the Act, the Court recognized Nixon's privacy interest in many of the tape recordings, finding that § 104(a)(7) of the Act ensured Nixon's custody and control over purely private material. *See id.* at 454, 458–59, 97 S.Ct. at 2795–96, 2797–98.

During 1975 and 1976, the Administrator submitted three sets of regulations implementing the Act to Congress. Under the original structure of the Act, regulations were to become effective on a certain date if Congress did not act upon them. *See* 44 U.S.C. § 2111 note § 104(b) (repealed 1984). This arrangement obtained until the Su-

preme Court held the legislative veto unconstitutional in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Each of these three proposed sets of regulations contained provisions for making copies of the original tapes, and specified that the Administrator would retain tapes or documents that included both private and publicly disclosable material. *See, e.g.*, Proposed Regulation § 105–63.401–5(c), S. REP. No. 94–368, at 36 (1975). Congress rejected portions of each set of regulations.[2]

In 1977, the Administrator submitted a fourth set of regulations, which were to take effect absent congressional disapproval on December 16, 1977. *See* 42 Fed.Reg. 63,626 (1977). Like the first three proposed sets of regulations, these regulations specified that the Archivist could retain permanently tapes that included both private and public material. *See id.* at 63,628. Nixon filed an action in District Court to challenge the fourth set of regulations. *See Nixon v. Solomon*, Civil Action No. 77–1395 (D.D.C.). However, before trial, the parties settled most of the disputed issues, entering into an agreement known as the "Solomon Agreement" which delineated certain amendments to the regulations and incorporated documents to be included in a "Processing Manual" to guide processing of archival material. The parties agreed that the amended regulations would delete all provisions under which the Administrator purported to retain portions of tapes containing purely private materials.

Pursuant to the Solomon Agreement, the Administrator submitted a fifth set of regulations to take effect March 7, 1980. *See* 45 Fed.Reg. 14,855, 14,856 (1980). The regulations provided that review and deletion of private material would be performed on copies of the original tapes. Unlike the earlier versions of the regulations, these regulations eliminated the provision permitting the Administrator to retain tapes containing private as well as public materials. *See* 45 Fed.Reg. at 14,858. The District Court subsequently decided the issues unresolved by the Solomon Agreement. In *Nixon v. Freeman*, 670

F.2d 346 (D.C.Cir.1982), this court affirmed the District Court and upheld the regulations promulgated pursuant to the Solomon Agreement.

In 1984, Congress transferred the Administrator's functions to the Archivist of the United States in his capacity as head of the National Archives and Record Administration ("Archives") and purged the Act of the legislative veto provision it had formerly contained. At the same time, the Archivist modified his interpretation of the executive privilege provision of the regulations. We reversed this modification in *Public Citizen v. Burke*, 843 F.2d 1473 (D.C.Cir.1988). In a subsequent case, we clarified the constitutional right to compensation that arose under the Act. *See Nixon v. United States*, 978 F.2d 1269 (D.C.Cir.1992).

Some time in the 1980s, the Archives made an analog master copy of the complete original tapes. *See Nixon v. Freeman*, 670 F.2d at 353 (stating that Phase I processing which included "duplication of tapes" was complete); Letter from James J. Hastings, National Archives, to Herbert J. Miller 2 (Apr. 8, 1987), *reprinted in* Joint Appendix ("J.A.") 198 (referring to Archivist's intention to return private material to Nixon from "master copy of the tapes"). In 1993, the Archives made a second analog copy and a digital copy. The copies were apparently made because the original copy had begun to deteriorate.

As of March 1992, the Archivist had only released to the public the approximately sixty hours of tapes used in evidence in Watergate-related prosecutions. On March 19, 1992, the public interest group Public Citizen and Professor Stanley I. Kutler filed suit against the Archivist in District Court demanding release of all tapes that the Archivist had determined were not restricted from release by law. In June 1993, the Archivist announced his intention to commence releasing brief portions of the tapes that related to the Watergate affair. Nixon objected, and on August 9, 1993, obtained a preliminary injunction from the District Court prohibit-

---

**2.** *See* S. Res. 244, 94th Cong. (1975) (enacted); S. Res. 428, 94th Cong. (1976) (enacted); H.R. Res. 1505, 94th Cong. (1976) (enacted).

ing further release until the Archivist returned private portions of the tapes to Nixon. *See* J.A. 385. The injunction was lifted when the parties entered mediation; however, the mediation did not resolve the crucial issues surrounding the return of the tapes.

In the spring of 1994, the Archivist gave Nixon approximately 820 hours of tapes of conversations it deemed personal and private. (The total tapes comprise approximately 4,000 hours of recorded material.) The transferred tapes of the conversations were physically removed from the first analog master copy. The Archives also undertook to delete all these passages from the digital master tape electronically. However, the Archivist retained control over the entirety of the original tapes and the second analog master copy. Two versions of the complete tapes, including the personal and private conversations, now exist in the Archivist's control. The Archivist subsequently promulgated regulations effective May 23, 1996, providing that "[n]o physical part of any original tape recordings ... shall be transferred to former President Nixon or his heirs." 59 Fed.Reg. 14,128, 14,132 (1994) (amending 36 C.F.R. § 1275.48(a) (1995)).

On April 12, 1996, Nixon's estate, the Archivist, Public Citizen, and Professor Kutler entered a settlement agreement specifying a procedure for release of the public conversations on the tapes. *See* J.A. 269. The Archivist, however, did not agree to return to the Nixon estate either the original versions or the copies of the private conversations in the Archives' possession. The Archivist maintained that he had a statutory duty to retain the entirety of the tapes; the parties then turned to the District Court to resolve this issue. Public Citizen and Professor Kutler agreed with the estate's position that the Archivist must return all versions of portions of the tapes consisting of private material. The District Court granted the estate summary judgment, directing the Archivist to erase from the tapes it held, including the original tapes, all of the segments the contents of which had been turned over to Nixon. *See Kutler v. Carlin,* No. 92–0662 (D.D.C. Mar. 31, 1997). The Archivist appealed to this court, and we review the District Court's grant of summary judgment *de novo.*

## II. ANALYSIS

### A. The Meaning of the Act

 The meaning of the Act is as clear to us today as it was to the Supreme Court when it upheld the constitutionality of the Act some twenty years ago. By its terms, the Act requires the Archivist to gain and retain control over "all original tape recordings of conversations" recorded by a federal employee and involving President Nixon or other federal employees at the White House and other presidential residences (at Camp David, Key Biscayne, and San Clemente) between the beginning of President Nixon's first term in office on January 20, 1969, and his resignation on August 9, 1974. *See* § 101(a). The Act then requires the Archivist to promulgate regulations to provide public access to the tapes and other materials. The Act specifies that the regulations "shall take into account" seven different "factors." *See* § 104(a). The seventh factor is the one at issue in this case. Under it, the regulations must take into account

the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

§ 104(a)(7).

The "need described in paragraph (1)" is "the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate.'" *See* § 104(a)(1). In short, § 104(a)(7) requires the Archivist to enact regulations that take into account the need to "give" Nixon or his estate "sole custody" of materials not likely to be related to the Watergate affair and not otherwise historically significant.

In order to reconcile the requirement of § 104(a)(7) with the requirement of § 101(a) that the Archivist retain control of the "original" tape recordings, § 104(c) of the Act creates a general exception to the other pro-

visions of the Act for tapes "given" to President Nixon or his estate pursuant to § 104(a)(7):

> The provisions of this title shall not apply ... to any tape recordings or other materials given to Richard M. Nixon, or his heirs, pursuant to subsection (a)(7).

§ 104(c).

The text and structure of the Act indicate that Congress plainly intended § 104(a)(7) to require the return to President Nixon of all versions of materials deemed by the Archivist "not likely to be related" to Watergate and "not otherwise of general historical significance." *See* § 104(a)(7). The Act specifies that the materials to be given to Nixon under § 104(a)(7) be given to him "for his *sole custody and use*." *Id.* (emphasis added). If the Archivist were to maintain versions of the conversations contained in these materials, then Nixon's estate could not be said to exercise either sole custody over them or sole use of them. Rather, custody and use would be shared with the Archivist.

The words "sole custody and use" surely cannot have the trivial meaning that no one other than Nixon may exercise dominion over the particular copy of the materials given to him; this, after all, is typically true of all property in someone's possession. If Congress were to present someone with its Medal of Honor, it would hardly be necessary to indicate in the statute of conferral that the recipient should be "given" the medal for her "sole custody and use." It would be obvious that the word "give" conferred a normal property right in the medal. Thus, the words "sole custody and use" in § 104(a)(7) must be intended to give Nixon exclusive control over the private material.

Furthermore, if § 104(a)(7) permitted the Archivist to retain a full copy of all the tapes, and intended merely to do Nixon the favor of allowing him access to private materials thereon, there would be no imaginable reason for the statute to require conveying *only* the private material to Nixon. It would suffice to give Nixon or his estate a complete copy of the materials, one which contained private as well as publicly available material. Because § 104(a)(7) requires an affirmative *giving* of the private materials to Nixon, not merely a negative withholding from the public, it is clear that the provision seeks to do more than simply express Nixon's need for privacy vis-à-vis the public.

It should also not escape our attention that § 104(c) of the Act, which creates an exception to the provisions of the Act for tapes given to Nixon under § 104(a)(7), can only have meaning if § 104(a)(7) contemplated the return to Nixon of at least the original versions of the private conversations on the tapes obtained by the Archivist. The retention provision of the Act requires that the Archivist keep specifically the "*original* tape recordings*" made at the executive residences. *See* § 101(a) (emphasis added). If § 104(a)(7) required only that Nixon be given copies of the original recordings, then the requirement that the Archivist give Nixon tapes (contained in § 104(a)(7)) would not be inconsistent with the requirement that the Archivist retain the original tapes (contained in § 101(a)). If the two provisions were consistent, there would be no need for § 104(c) to carve out an exception for materials given to Nixon under § 104(a)(7). The exception provision would be rendered mere surplusage. It follows that when enacted, the Act contemplated the transfer to Nixon of some portion of the original tapes, the only tapes mentioned by the Act.

In short, § 104(c) plainly exempts the private material returned to Nixon from "[t]he provisions of this title"—including the requirement in § 101(a) that the Archives "retain" the "original tape recordings." It is therefore specious for the Archivist to suggest, as he did before this court, that § 101(a) of the Act actually requires him to retain the complete original version of the tapes. The Archivist proposes a statutory reading which inelegantly reconciles his obligation to return some portions of the tapes with the supposed requirement of retention of all the tapes by explaining that he must give Nixon's estate *copies* of the private conversations while retaining the originals. But this reading makes the exception provision of § 104(c) into an empty shell.

It might be suggested that § 104(c) excepts the tapes given to Nixon from the ban

on destruction imposed by § 102(a). ("None of the tape recordings or other materials referred to in Section 101 shall be destroyed, except as hereafter may be provided by law.") But any such suggestion would be specious in light of the Archivist's reading. On his reading, the Archivist would retain a version of all material given to Nixon; consequently, even if Nixon destroyed copies of tapes given to him, he would not be destroying either originals or sole copies, but only his own personal copies of the materials, which are not referred to in § 101 and are therefore not protected by § 102(a).

The only imaginable reason to understand § 104(a)(7) as anything other than an affirmative requirement to return all versions of private materials to Nixon would arise if there existed some mutual exclusivity or contradiction between effectuating their return and carrying out the other requirements of the Act that are unaffected by § 104(c). But no such difficulty arises, because the elements of the Act are fully coherent. The Archivist suggests that, if he had to cut and splice the original version of the tape in order to turn over the private portions to Nixon, adjacent historically relevant portions of the increasingly fragile original tape might be irreparably damaged. This, the Archivist argues, would violate the Act's twin mandates that all historically relevant materials be retained, *see* §§ 101(a), 104(a)(7), and that none of the tapes covered by the Act be "destroyed," *see* § 102(a).

This suggestion of inconsistency is unfounded. Under 44 U.S.C. § 2116(a) (1994), the Archivist can satisfy a requirement to retain an *original* document or tape by means of a copy of the original tape or document. There currently exist three complete copies of the tapes covered by the Act: two analog and one digital. The Archivist's expert conceded that editing these analog or digital copies of the tapes to remove the private material would do no harm to the adjacent historically relevant material on the copies. *See* Expert Declaration of James Wheeler, J.A. 276. As a result, even if the original tapes were somehow injured in the process of editing out the private material, and even if damage resulted to adjacent his-

torically relevant, protected material, the copies of this adjacent material would still exist. These copies would suffice to fulfill the mandate of § 101(a) that such material be retained by the Archivist.

The existing copies of historically relevant adjacent material would also save the Archivist from a violation of the requirement of § 102(a) that no such material be destroyed. In light of the sufficiency of copies under 44 U.S.C. § 2216(a), the requirement of § 102(a) that material not be destroyed clearly does not confer sacred status on the physical substrate of the original tapes. What must not be destroyed under § 102(a) is the *content* of any of the protected material, not the physical substrate on which that content is recorded.

■ This commonsense reading of § 102(a) is borne out by the fact that the original tapes are already deteriorating as a result of the breakdown of the chemicals of which they are composed. *See* Expert Declaration of James Wheeler, J.A. 275–76 ("some of the original tapes are in an advanced stage of degradation and may already be difficult to play"). Because of this inevitable process of deterioration, the "tapes" which the Archivist must preserve for the purposes of the Act will soon become (if they have not already become) the copies of the tapes. It cannot seriously be maintained that Congress intended § 102(a) to require the preservation of the deteriorated original tapes in perpetuity, like shards of the Tablets of the Law preserved in the Ark. At oral argument, counsel for the Archivist ventured to suggest that future technological developments *might* make the actual original tapes indispensable for some sort of archeological project of sound enhancement. But this belated and wholly unsupported claim was not made before the District Court, and is therefore waived. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

*B. The Supreme Court's Interpretation of the Act*

We are neither the only nor the highest court to have interpreted § 104(a)(7) of the Act to require that the Archivist transfer

control over private materials to President Nixon's estate. The Supreme Court expressly and repeatedly understood § 104(a)(7) to require such a transfer in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). In introducing the Act, the Court first explained that it required the Administrator of General Services (now the Archivist)

> to take custody of the Presidential papers and tape recordings ... and promulgate regulations that (1) provide for the orderly processing and screening ... of such materials for the purpose of returning to [Nixon] those that are personal and private and nature....

*Id.* at 429, 97 S.Ct. at 2783. This description makes it clear that specifically "those" of the papers and recordings that are "personal and private" must be returned. The Court's formulation certainly anticipated the return of the private portions of the same original tapes which the Archivist was charged with obtaining.

Next, in the course of explaining why the Act was not overbroad in seeking to achieve its objectives of public disclosure relating to the Watergate affair, the Court observed:

> It is true that among the voluminous materials to be screened by archivists are some materials that bear no relationship to any of these objectives (and whose prompt return to [Nixon] is therefore mandated by § 104(a)(7)). But these materials are commingled with other materials whose preservation the Act requires....

*Id.* at 454, 97 S.Ct. at 2795. The parenthetical expression leaves no doubt that § 104(a)(7) operates to *mandate* return of private materials to Nixon. What is more, the Court in this passage expressed its concern that government archivists (*not* the public) would see private materials; the Court then indicated that one element justifying the constitutionality of the Act despite this exposure was the fact that under § 104(a)(7), private materials were not to remain under government control, but were to be "returned" to Nixon. Thus, the passage certainly understands § 104(a)(7) to require the return to Nixon of private material such that

the material *would not remain in government hands.*

The Court made this understanding of § 104(a)(7) still more explicit in arguing that the Act's protection of privacy was even greater than that afforded by the New York State law protecting private medical information in state computers upheld in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The Court reasoned:

> Not only does the Act challenged here mandate regulations similarly aimed at preventing dissemination of private materials but, unlike *Whalen*, the Government *will not even maintain long-term control* over such private information; rather, purely private papers and recordings will be returned to [Nixon] under § 104(a)(7) of the Act.

433 U.S. at 458–59, 97 S.Ct. at 2798 (emphasis added). The Court's unmistakable substantive understanding that the Government would not maintain control over the private materials once they were returned to Nixon establishes definitively that the Archivist must return all versions of the private material to Nixon. The form of the Court's reasoning here further supports this conclusion. The Court deliberately contrasted the New York statute with the Act, explaining that the Act was more protective of privacy. Both the New York law and the Act protected private materials from the public, but the former allowed the private material to remain permanently in the hands of the State, while the latter denied the government such long-term control over private material by requiring its return to Nixon. This *a fortiori* analysis makes sense only if the Act is interpreted to require that no copies of the materials remain in government control.

### C. This Court's Previous Interpretation of the Act and the Regulations Thereunder

The text and structure of the Act, and the Supreme Court's interpretation of it, suffice to establish that the Act requires the return of all versions of private materials to the Nixon estate. Nonetheless, it is worth observing that this court has interpreted the Act and the regulations promulgated pursuant to § 104 to the same effect. Pursuant to the Solomon Agreement reached with Nixon,

the Administrator adopted regulations to facilitate screening of the tapes for identification of private material and its return to Nixon. These regulations specified that "[i]n processing the materials, the archivists will give priority to segregating private or personal materials and transferring them to their proprietary or commemorative owner...." 41 C.F.R. § 105–63.401(a) (1980); later 36 C.F.R. § 1275.42(a) (1995) (now amended, *see* 36 C.F.R. § 1275.42(a)(1) (1997)). The regulations also stated that the Administrator "will transfer *sole custody and use* of those materials determined to be private or personal ... to former President Nixon or his heirs...." 41 C.F.R. § 105–63.401–3(a) (1980); later 36 C.F.R. § 1275.48(a) (1995) (now amended, *see* 36 C.F.R. § 1275.48(a) (1997) (emphasis added)).

In *Nixon v. Freeman,* 670 F.2d 346 (D.C.Cir.1982), we upheld the constitutionality of regulations adopted pursuant to the Solomon Agreement. There, we took note that

> The parties [Nixon and the Administrator] are in agreement that, once diary material is identified by means of archival processing, the archivists must return the material immediately to Mr. Nixon. The regulations require no less, stating that the archivists, in processing the materials, are to give priority to segregating and returning the materials to their owner. 41 C.F.R. § 105–63.401(a) (1980).

670 F.2d at 361. We also observed that "the regulations charge the archivists to give priority to separating and returning to Mr. Nixon 'private and personal materials.'" *Id.* at 355. Although we noted that the Archivist had duplicated the tapes, *see id.* at 353, nothing in our opinion in *Nixon v. Freeman* indicated or assumed that the Archivist would retain portions of tapes that included private material. The regulations interpreted by the court did not mention such a possibility. Thus, the references in our opinion to immediate return suggest that we interpreted the Act and the regulations promulgated thereunder to require return of all existing versions of private material to Nixon.

## D. The Plain Meaning of the Act

In sum, the meaning of the Act poses no real difficulty. As the Supreme Court and this court always have understood it, the Act requires that all copies of all materials deemed by the Archivist to fulfill the definition adopted by the Archivist to satisfy § 104(a)(7) be returned to President Nixon or his heirs. This requirement of the Act still confers authority on the Archivist to promulgate regulations specifying the standard by which § 104(a)(7) will be fulfilled; it also confers on the Archivist the crucial discretion to determine what particular materials fulfill the definition. By these mechanisms, the Act balances the potential conflict between the broad disclosure necessary to restore public confidence in the wake of the Watergate affair, and the legitimate privacy concerns of President Nixon and those close to him.

At the same time, § 104 of the Act requires the Archivist to regulate and make decisions in a manner consistent with the statutory guidelines. It has been said that

> statutory lists of decisionmaking factors rarely constitute "a set of self-executing principles.... On the contrary, those principles may overlap and may conflict, and where this occurs, resolution is the task of the agency that is expert in the field."

*American Airlines, Inc. v. C.A.B.,* 495 F.2d 1010, 1018 (D.C.Cir.1974) (quoting *Schaffer Transp. Co. v. United States,* 355 U.S. 83, 92, 78 S.Ct. 173, 178, 2 L.Ed.2d 117 (1957)). But here, as we have shown, the statutory factors in question do not conflict, because § 104(c) resolves the potential contradiction between § 101(a) and § 104(a)(7).

■ The deference that might be appropriate in reviewing regulations enacted pursuant to conflicting statutory instructions is not appropriate in analyzing regulations enacted pursuant to consistent guidelines. Here, the statutory guidelines always consistently required that all versions of private material be returned to President Nixon or his estate. Requiring this complete return, as opposed to preserving versions of all portions of the tapes for eternity, was a policy determination proper to Congress which

Congress clearly intended. This being the case, we are constrained to enforce the will of Congress. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

*E. Appellant's* Chevron *"Step Two" Argument*

■ The Archivist seeks to argue that, under the second step of *Chevron,* the statutory language before the court today is sufficiently ambiguous to merit deference to the interpretation of the Archivist, the regulatory agent to whom administration of the statute is entrusted. *See Bell Atlantic Tel. Companies v. FCC,* 131 F.3d 1044, 1048–49 (D.C.Cir. 1997). But even if the meaning of the statute were somehow unclear, the Archivist would still be barred from interpreting the statute to require retention of the private, historically insignificant portions of the tapes. This is so because, on the record at hand, such an interpretation could not possibly meet the test of *reasonableness* required by *Chevron.* Or as then-Judge Ruth Bader Ginsburg noted in *Fedway Associates v. U.S. Treasury,* 976 F.2d 1416, 1424 (D.C.Cir. 1992), "we would have ranked [the agency's] definition ... in this case 'unreasonable' under the second part of the *Chevron* analysis even had this court not come earlier to a confident conclusion regarding Congress' intent under the first part of the *Chevron* analysis."

We need not focus unnecessarily on the question of whether the Archivist's interpretation falls afoul of congressional intent under *Chevron* step one or is simply unreasonable under *Chevron* step two. In either case we are satisfied that it is not a permissible interpretation of the Act. However, quite apart from the specific nature of the Archivist's purported reading, we are convinced that two major impediments exist to the Archivist advancing and claiming deference for *any* interpretation other than the straightforward one we today endorse. These impediments are (1) the Archivist's prior commitment, in a binding agreement, to returning private material to Nixon, and (2) the Supreme Court's clear interpretation of the Act.

■ First, as noted above, the regulations promulgated by the Archivist for processing the private materials and identifying private portions for return to Nixon were enacted pursuant to the Solomon Agreement that the Administrator entered with Nixon. *See* Solomon Agreement, J.A. 537–93. Those regulations required segregation of "private or personal materials," 41 C.F.R. § 105–63.401(a), the "sole custody and use" of which would be transferred to Nixon, 41 C.F.R. § 105–63.401–3(a), and were so interpreted by this court. *See Nixon v. Freeman,* 670 F.2d at 361. The Solomon Agreement also incorporated as an attachment "documents to be included" in a Processing Manual which, according to the Agreement, "explain[ed] the manner in which certain of the regulations will be interpreted or applied." J.A. 537. Those pieces of the Processing Manual constitute part of the Solomon Agreement for the purposes of interpreting the regulations. *See WMATA v. Mergentime Corp.,* 626 F.2d 959, 962 n. 3 (D.C.Cir.1980) ("Reference in a contract to extraneous writings renders them part of the agreement for the indicated purposes."). The sections of the Processing Manual included in the Agreement explicitly and repeatedly contemplate the "return" of private documents or tapes to Nixon. *See, e.g.,* J.A. 568, 572, 575.

More strikingly, the documents to be included in the Processing Manual specify that when a processing archivist determines that recorded material is private or personal,

> the processing archivist shall immediately prepare for the return of the document or tape and all duplicate copies that are reasonably located. Should another copy or copies of such document or tape subsequently surface, it shall be returned at once without further archival review.

J.A. 576. This description indicates in no uncertain terms that the Archivist will return to Nixon all versions of private material.

By the Agreement and the regulations, the Government positively adopted an interpreta-

tion of the Act requiring return of all versions of personal material to Nixon. The Nixon estate had every good reason to assume that the Solomon Agreement, which settled several disputed issues in pending litigation, resulted in an enforceable arrangement as against claims to the contrary by the Archivist. Indeed, the Archivist does not claim that the agreement was *ultra vires* and we have no doubt as to its meaning. Therefore, it would be a bizarre result, especially at this late date, to allow the Archivist to abrogate the parties' agreement by regulatory fiat. *Cf. Beo v. District of Columbia,* 44 F.3d 1026, 1029 & n. 1 (D.C.Cir.1995) (noting that individuals may gain constitutional liberty interest in state of affairs specified first by consent decree and subsequently extended through promulgation of regulations).

As a general matter, an agency may have the authority to revise its regulations; however, it is highly doubtful that an agency is entitled to claim deference for a particular statutory interpretation where it has committed itself to a lawful, contradictory interpretation by unmodified agreement with a private party. *Cf. Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 614 (D.C.Cir.1992) (expressing "concern" about applying *Chevron* deference to agency interpretation of statute that will affect agreements agency has entered).

A further difficulty with the Archivist's claim to *Chevron* deference lies in the fact that, as demonstrated above, the Supreme Court adopted an interpretation that, unlike that proffered by the Archivist, required return of all versions of the tapes to Nixon. *See Nixon v. Administrator,* 433 U.S. at 429, 454, 458–59, 97 S.Ct. at 2783, 2795–96, 2797–98. As a result, the Archivist is hard pressed to defend an alternative interpretation—twenty years after the Supreme Court has spoken, with no legislative amendments to construe, and no purported "changed circumstances" justifying a new statutory construction. *See McClatchy Newspapers, Inc. v. NLRB,* 131 F.3d 1026, 1030 (D.C.Cir.1997) (suggesting that agency not entitled under *Chevron* to "alter" Supreme Court's authoritative interpretations even if otherwise permissible). *See also Maislin Indus., U.S.,*

*Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning."). Even assuming, *arguendo,* that the Act somehow admits of ambiguity, the perceived ambiguity has been cured by judicial interpretation. On this record, the Archivist is poorly placed to demand *Chevron* deference.

### III. CONCLUSION

For the foregoing reasons, we find that the regulations promulgated by the Archivist prohibiting the return to President Nixon's estate of any part of the original tapes or master copies are not in accordance with § 104(a)(7) of the Act. Accordingly, the decision of the District Court is

*Affirmed.*